**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Vectair Systems Inc.,

                                   Case No. 24-cv-01454 (JMB/ECW)

          Plaintiff and
          Counterclaim Defendant,

v.                                       **ORDER**

Fresh Products, Inc.,

          Defendant and
          Counterclaimant.

---

Plaintiff and Counterclaim Defendant Vectair Systems Inc. ("Vectair") is a manufacturer and supplier of urinal screens for restrooms. (Dkt. 1 ¶ 7.) Defendant and Counterclaimant Fresh Products, Inc. ("Fresh Products") owns three utility patents and one design patent directed to urinal screens (collectively, "Patents in Suit"). (*Id.* ¶¶ 18-25.) Vectair filed this lawsuit seeking a declaratory judgment that it has not infringed any of the Patents in Suit and that the Patents in Suit are invalid. (*See id.* ¶¶ 27-89.) Fresh Products denies Vectair's allegations and filed counterclaims alleging Vectair infringes the Patents in Suit. (*See generally* Dkt. 4 (Answer and Counterclaim); Dkt. 12 (Answer and First Amended Counterclaim).)

This case is before the Court on the parties' disputes as to the construction and invalidity of certain claims of the Patents in Suit. (*See generally* Dkt. 36 (Joint Claim

Construction Statement); Dkt. 68 (First Amended Joint Claim Construction Statement).)

The Court resolves those disputes in this Order.[1]

## I.   FACTUAL AND PROCEDURAL BACKGROUND

The three utility patents asserted by Fresh Products are U.S. Patent No. 10,145,098

("the '098 patent"), U.S. Patent No. 10,501,924 ("the '924 patent"), and U.S. Patent No.

11,396,745 ("the '745 patent").  The '098 patent (Dkt. 78) claims priority to U.S.

Provisional Application No. 62/075,827, filed on November 5, 2014; the '924 patent

(Dkt. 78-1) is a continuation of the '098 patent; and the '745 patent (Dkt. 78-2) is a

continuation of U.S. Patent No. 11,198,997 (not asserted here), which is a continuation of

the '924 patent.  ('098 patent, at [60]; '924 patent, at [63]; '745 patent, at [63].)  The

parties acknowledge that as continuation patents, the '098, '924, and '745 patents

(collectively, "the utility patents") share a common specification.[2]  (Dkt. 68 at 4 n.2; Dkt.

69 at 13; Dkt. 79 at 6.)[3]  The Technical Field of the Invention of the utility patents states

that "[c]ertain embodiments discussed herein relate to restroom screens and mats, and,

---

[1]     Pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil
Procedure, the parties have consented to the jurisdiction of the undersigned United States
Magistrate Judge "for claim construction and to the extent that there is summary
judgment practice as to claim construction issues that are more appropriately resolved by
way of a summary judgment motion."  (Dkt. 46; *see also* Dkt. 63 (order of reference).)

[2]     Because the utility patents share the same specification, unless otherwise stated,
the Court cites only to the '098 patent (Dkt. 78) when discussing the specification.  For
clarity, the Court cites the relevant patents by the last three digits of the patent number
rather than by the docket entry number.

[3]     Unless otherwise stated, page number citations in this Order are to the page
number assigned by CM/ECF.

**more particularly**, the present inventions relate to restroom urinal screens and mats."
('098 patent, at 1:13-15 (emphasis added).)

The design patent asserted by Fresh Products is U.S. Design Patent No. D778,411 (Dkt. 78-3), filed on November 5, 2014 ("the D'411 patent"). (D'411 patent, at [22].) It claims an "ornamental design for a urinal screen, as shown and described." (*Id.*, at [57].)

The parties agree on the following constructions for two claim terms in the utility patents. (Dkt. 68 at 2.) The Court adopts those agreed constructions because they are consistent with the claims and the intrinsic record.

| Claim Term | Patent Claim(s) | Construction |
|---|---|---|
| "corner(s)" | '098 patent, claims 3, 4, 7-10, 19, 30, 32, 33, 37, 51, and 52<br><br>'924 patent, claims 5, 7, 21, and 28 | '098 and '924 patents: "an intersection of braces" |
| | '745 patent, claims 1, 3, and 5 | '745 patent: "an intersection of sides" |
| "tessellation" | '098 patent, claim 20<br><br>'924 patent, claims 1, 21, 28 | "A pattern of openings comprising a covering of a geometric plane without gaps or overlaps by congruent plane figures of one type or a few types" |

The parties dispute the meaning of five groups of claim terms in the utility patents and also dispute whether certain of those terms are indefinite. For the reasons discussed in Section III, the Court finds that Vectair has not shown by clear and convincing evidence that any of those terms are indefinite and construes them as follows:

| Claim Term | Patent Claim(s) | Construction |
|---|---|---|
| "urinal screen" | '098 patent, claims 1-55 | No construction, plain and ordinary meaning |
| "reversible urinal screen" | '924 patent, claims 1-33 | |
| | '745 patent, claims 1- 20 | |
| "surface area of the frame as observed perpendicular to" | '098 patent, claims 1, 13, 15 and 48- 50 | No construction, plain and ordinary meaning |
| "surface area of the urinal screen as observed perpendicular to" | '924 patent, claims 24 and 31 | |
| "overall surface area of the flexible frame as viewed normal to" | '745 patent, claims 1, 2, 15, and 16 | |
| "reduce splashing" | '098 patent, claims 38 and 54 | No construction, plain and ordinary meaning |
| | '924 patent, claims 21 and 28 | |
| | '745 patent, claims 1 and 15 | |
| "contoured side surface" | '098 patent, claim 54 | No construction, plain and ordinary meaning |
| "contoured upper and lower surfaces" | '924 patent, claims 1 and 21 | |

As to the D'411 patent, Vectair makes several arguments relating to invalidity and proposes a lengthy construction for its sole claim. For the reasons stated in Section V, the Court finds that Vectair has not shown by clear and convincing evidence that the sole claim of the D'411 patent is invalid for lack of definiteness, enablement, written

description, or ornamentality. The Court construes the sole claim of the D'411 patent as:

"The overall ornamental appearance of the urinal screen as shown in Figures 1-14."

## II.   LEGAL STANDARD – UTILITY PATENTS

### A.   Claim Construction

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citation modified). It is the province of a court, not the jury, to construe patent claims. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372, 391 (1996). When construing claims, the words of a claim "are generally given their ordinary and customary meaning," which is the meaning they "would have to a person of ordinary skill in the art in question[4] at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312-13.

---

4       Fresh Products contends that a person of ordinary skill in the relevant art would have a bachelor's degree in mechanical engineering and one to two years of experience with the design or testing of splash reduction methods and devices, or, alternatively, would have had formal education in some field other than mechanical engineering and would have had more hands-on experience (five or more years) in the design of urinal screens. (Dkt. 79 at 21 n.3.) Vectair argues that a person of ordinary skill in the art would have Bachelor of Science degree in mechanical engineering or a college degree in a technical field with at least one year of bathroom or kitchen fixture accessory or similar product analysis, design, or manufacturing experience, or, alternatively, could be an individual with a college degree in a non-technical field with at least 2-3 years of experience in bathroom or kitchen fixture accessory or similar product analysis, design, or manufacturing. (Dkt. 69 at 15-16.) The parties do not identify any term for which any difference in their proposed persons of ordinary skill in the art matters, and the Court concludes that there is no term for which any difference does matter. Consequently, the Court does not make any finding as to the person of ordinary skill in the art in this Order.

"[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. At times, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. At other times, "the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent," and a court must "look[] to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *Id.* (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)). Those sources include intrinsic evidence and extrinsic evidence. *See Phillips*, 415 F.3d at 1317 ("Although we have emphasized the importance of intrinsic evidence in claim construction, we have also authorized district courts to rely on extrinsic evidence.").

Intrinsic evidence consists of the patent claims, the specification (including the figures), and the prosecution history, where the prosecution history is "the complete record of the proceedings before the [United States Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1314, 1317; *see also Interactive Gift Express, Inc. v. CompuServe Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001). Extrinsic evidence is "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned

treatises." *Phillips*, 415 F.3d at 1317 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995)).

"[I]ntrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Interactive Gift Express*, 256 F.3d at 1331 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *see also Phillips*, 415 F.3d at 1317 (holding that intrinsic evidence is more significant than extrinsic evidence). Beginning with the claim language itself, "the use of a term within the claim provides a firm basis for construing the term." *Phillips*, 415 F.3d at 1314. "Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term." *Id.* In addition to the claims: "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* at 1315 (quoting *Vitronics*, 90 F.3d at 1582). "The importance of the specification in claim construction derives from its statutory role, requiring that the specification describe the claimed invention in full, clear, concise, and exact terms." *Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, 130 F.4th 1372, 1381 (Fed. Cir. 2025) (citation modified); *see also* Robert A. Matthews, Jr., *Introduction—Specification*, 1 Annotated Patent Digest § 1:22 (2025) ("The specification consists of a written description of the invention used to teach the invention and aid in interpreting the patent claims.").

While extrinsic evidence "can shed useful light on the relevant art," it is "less reliable," "is less significant than the intrinsic record in determining the legally operative meaning of disputed claim language," and cannot be "used to contradict claim meaning

that is unambiguous in light of the intrinsic evidence." *Phillips*, 415 F.3d at 1317-18, 1324 (citation modified); *see also Regeneron Pharms.*, 130 F.4th at 1383. "If the meaning of a claim term is clear from the intrinsic evidence, there is no reason to resort to extrinsic evidence." *Seabed Geosolutions (US) Inc. v. Magseis FF LLC,* 8 F.4th 1285, 1287 (Fed. Cir. 2021).

**B.      Indefiniteness**

"Definiteness is a statutory requirement for patentability." *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1346 (Fed. Cir. 2022) (citing 35 U.S.C. § 112 ¶ 2.) A patent's specification must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention." 35 U.S.C. § 112(b).[5] "A claim is indefinite only if, when read in light of the specification and prosecution history, it fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Niazi Licensing*, 30 F.4th at 1346 (quoting *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014)) (citation modified)). "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012). However, while a question of law, indefiniteness "can involve

---

[5]      The Leahy-Smith America Invents Act ("AIA") renamed 35 U.S.C. § 112 ¶ 2 as § 112(b). *See Media Rts. Techs., Inc. v. Cap. One Fin. Corp.*, 800 F.3d 1366, 1371 n.1 (Fed. Cir. 2015) (citing AIA, Pub. L. No. 112–29, 125 Stat. 284 (2011)). The Patents in Suit were filed after the date the AIA took effect (that is, after September 16, 2012), and therefore the AIA version of § 112 applies to the Patents in Suit. *See id.*

underlying factfindings based on extrinsic evidence." *Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*, 97 F.4th 915, 936 (Fed. Cir. 2024).

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901. Like claim construction, a definiteness analysis evaluates a patent's claims in light of the claims, specification, prosecution history, and extrinsic evidence. *Id.* at 911-12; *see also Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1381 (Fed. Cir. 2015) ("In the face of an allegation of indefiniteness, general principles of claim construction apply."). Any fact critical to a finding of indefiniteness must be proven by clear and convincing evidence. *Grace Instrument Indus., LLC v. Chandler Instruments Co., LLC*, 57 F.4th 1001, 1008 (Fed. Cir. 2023); *see also Young v. Lumenis*, 492 F.3d 1336, 1345 (Fed. Cir. 2007) ("Because a patent is presumed to be valid, the evidentiary burden to show facts supporting a conclusion of invalidity is one of clear and convincing evidence.").

### III.   DISPUTED CLAIM CONSTRUCTIONS – UTILITY PATENTS

### A.   "Urinal Screen" and "Reversible Urinal Screen"

The preambles of claims 1-15, 17-21, 23-38, and 40-55 of the '098 patent recite: "[a] **urinal screen** comprising . . . ." ('098 patent, claims 1-15, 17-21, 23-38, and 40-55 (emphasis added).) Similarly, the preambles of claims 1-19 and 21-33 of the '924 patent and claims 1-20 of the '745 patent recite "[a] **reversible urinal screen** comprising . . . ." ('924 patent, claims 1-19 and 21-33 (emphasis added); '745 patent, claims 1-20

(emphasis added).)  The parties dispute both whether the "urinal screen" and "reversible urinal screen" terms in the preambles are limiting and if they are limiting, their construction.  Their positions are set forth in the following table:

| Claim Term | Patent Claim(s) | Vectair's Proposed Construction | Fresh Products' Proposed Construction |
|---|---|---|---|
| "urinal screen" | '098 patent, claims 1-55 | "Urinal" is non-limiting<br><br>Alternatively: A filter, mat, grate, guard, or the like capable of allowing urine, water, and other fluid to pass through it when used in, on, or otherwise as part of a urinal, toilet, or other bathroom appliance, and a "urinal" is a vessel for receiving urine or a fixture used for urinating | Plain and ordinary meaning<br><br>If "urinal screen" is further defined, "a screen used in a urinal and through which urine passes" |
| "reversible urinal screen" | '924 patent, claims 1-33<br><br>'745 patent, claims 1- 20 | "Reversible urinal" is non-limiting<br><br>Alternatively: "reversible" means having two finished usable sides | Plain and ordinary meaning<br><br>If "reversible" is further defined, "adapted to be reversed such that either side is usable as the top side or bottom side" |

(Dkt. 68 at 4.)

### 1.  Whether the "Urinal Screen" Preambles Are Limiting

The first dispute between the parties is whether the terms "urinal screen" and "reversible urinal screen" in the preambles are limiting, where patentee Fresh Products argues those terms are limiting and accused infringer Vectair contends they are not.  (*See generally* Dkt. 69 at 17-19; Dkt. 79 at 12-15.)

Vectair is correct that "generally, the preamble does not limit the claims." *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1236 (Fed. Cir. 2017)

10

(citation modified).  "A preamble is not a claim limitation if the claim body defines a structurally complete invention and uses the preamble only to state a purpose or intended use for the invention."  *Id.* (citation modified).  However, a preamble may be limiting under several circumstances.  *See id.*  Those include: if the preamble "recites essential structure or steps"; if claims depend on the term in the preamble for antecedent basis; if the preamble "is essential to understand limitations or terms in the claim body"; or if the preamble "recites additional structure or steps underscored as important by the specification."  *Id.* (citation modified).  In other words, "a preamble is a claim limitation if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim."  *Poly-Am., L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1309-10 (Fed. Cir. 2004) (quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999)).  Further, a preamble may be limiting if "there was 'clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art.'"  *Georgetown Rail Equip.*, 867 F.3d at 1236 (quoting *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002)).  "Whether to treat a preamble as a limitation is a determination resolved only on review of the entire patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim."  *Catalina Mktg. Int'l*, 289 F.3d at 808 (citation modified).

Beginning with the claim language, Fresh Products argues that the preambles are limiting because "***the body of most of the claims***" recites the "urinal screen" of the preambles.  (Dkt. 79 at 13.)  As one example, Fresh Products relies on Claim 1 of the '098 patent, reproduced below:

11

1. A urinal screen comprising:

a frame having:

> a first face;
>
> a second face opposite the first face; and
>
> a plurality of openings extending through the frame between the first face and the second face;

a plurality of first posts extending from the first face of the frame; and a plurality of second posts extending from the second face of the frame;

wherein the plurality of openings occupy at least half of a surface area of the frame as observed perpendicular to the first face of the frame when the frame is set on a flat surface;

wherein a plurality of ends of the plurality of first posts form a base upon which the **urinal screen** rests when the plurality of second posts point away from a surface upon which the **urinal screen** is set;

wherein a plurality of ends of the plurality of second posts form a base upon which the **urinal screen** rests when the plurality of first posts point away from a surface upon which the **urinal screen** is set;

wherein, when the **urinal screen** is set upon a surface in a urinal such that the first or second face of the frame is oriented toward the surface upon which the **urinal screen** is set, the frame is positioned away from the surface upon which the **urinal screen** is set by at least 1/3 of a thickness of the **urinal screen** as measured perpendicular to the first face of the frame;

wherein at least one of the plurality of first posts extends from a perimeter around each of said plurality of openings; and

wherein at least one of the plurality of second posts extends from a perimeter around each of said plurality of openings.

('098 patent, claim 1 (emphases added).)

The same is true of independent claim 38 of the '098 patent, as well as the

independent claims of the '924 and '745 patents, which recite a "reversible urinal screen"

12

in the preamble and then refer back to the "urinal screen" throughout the body. (*See* '098 patent, claim 38; '924 patent, claims 1, 21, 28; '725 patent, claims 1, 15.) Indeed, the "urinal screen" is used to define structural relationships within the body of the claims. (*E.g.*, '098 patent, claim 1 (reciting that the "plurality of first posts form a base upon which the urinal screen rests when the plurality of second posts point away from a surface upon which the urinal screen is set"); '745 patent, claim 15 (reciting that "at least a portion of the first plurality of protrusions can support the first face of the flexible frame above a urinal surface when the urinal screen is placed on the urinal surface with the first face of the flexible frame facing the urinal surface").) In short, the body of the claims depend on the "urinal screen" and "reversible urinal screen" terms in the preamble and they are "essential structure" necessary to give life, meaning, and vitality to the claims. *See Catalina Mktg.*, 289 F.3d at 808; *Poly-Am.*, 383 F.3d at 1309-10.

Moreover, as to each utility patent, the title is "Urinal Screen," the Technical Field "relate[s] to restroom screens and mats, and, more particularly, . . . restroom urinal screens and mats," the Summary of the Invention refers to "a urinal screen," the Discussion of the Related Art begins by referencing "[u]rinal screens," and the Brief Description of the Drawings of "the present inventions" refer to the embodiments as "urinal screens." ('098 patent, at [54], 1:10-3:61.) The Detailed Description of the Inventions in each utility patent repeatedly characterizes various embodiments of the invention as a "urinal screen." (*See generally* '098 patent, at 3:66-7:62.) All of this buttresses the conclusion that the "urinal screen" terms in the preambles are limiting. *See Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1358 (Fed. Cir. 2012) (concluding that

13

the phrase "rotary cutter deck" in a preamble was limiting when "[t]he title of the patent, the summary of the invention, and every drawing describe the invention as a deck for a rotary cutter"); *Poly-Am.*, 383 F.3d at 1310 (concluding that the phrase "blown-film" in a preamble was limiting when "[t]he specification is replete with references to the invention as a 'blown film' liner, including the title of the patent itself").

Vectair argues, however, that the fact that dependent claims 16, 22, and 39 of the '098 patent recite a "urinal system" including the "urinal screen" of their respective independent claims triggers the doctrine of claim differentiation and "emphasizes that use in a urinal is not required by the independent claims to the urinal screen alone."[6] (Dkt. 69 at 18.) Vectair also argues that the language in the specification stating that the urinal screen can be used in a "urinal, toilet, or other bathroom appliance" demonstrates that the "urinal screen" terms in the preamble are non-limiting. (*Id.*)

In particular, the specification states:

> An embodiment of a urinal screen 10 is illustrated in FIGS. 1-2. **The urinal screen 10 can be sized and shaped to fit into a urinal, toilet, or other bathroom appliance**. As illustrated, the urinal screen 10 can include a frame 14. The frame 14 can be sized and shaped to fit over all or a portion of a drain of a toilet or urinal.
>
> * * *
>
> **In some embodiments, the screen 10 is shaped to fit a particular urinal or toilet**.

('098 patent, at 3:67-4:15 (emphases added).)

---

[6]    Dependent claim 20 of the '924 patent recites a similar "urinal system." ('924 patent, at claim 20.)

Fresh Products responds that the above language describing these alternatives bolsters its argument that "Urinal Screen" is limiting because the patents distinguish a urinal from a toilet or other bathroom appliances. (Dkt. 86 at 9.) According to Fresh Products, "Vectair's proposal that 'urinal' is a 'vessel for receiving urine or a fixture used for urinating' could encompass a toilet and would thus contradict the specification's distinction between a urinal and a toilet." (*Id.* at 9-10.)

The Court first addresses Vectair's claim differentiation argument. "The doctrine of claim differentiation stems from 'the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope.'" *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1368 (Fed. Cir. 2005) (quoting *Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999)). The doctrine is strongest "where the limitation sought to be read into an independent claim already appears in a dependent claim," but "only creates a presumption that each claim in a patent has a different scope; it is not a hard and fast rule of construction." *Id.* (citation modified). Here, the Court finds that the doctrine of claim differentiation does not require the "urinal screen" terms in the preambles to be non-limiting; rather, the "urinal system" dependent claims differ from the "urinal screen" independent claims in several respects, including because they require a "urinal" as well as the antecedent "urinal screen." (*See* '098 patent, at claims 16, 22, and 39.) Indeed, these dependent claims reinforce that the claimed urinal screen is to be used in a urinal because they further limit it as "configured to be positioned on the bottom surface of the urinal" or as being "placed upon the urinal surface." (*Id.*)

15

The Court also concludes that the specification's statement that the urinal screen can be sized and shaped to fit in other bathroom appliances, including a toilet, does not overcome the repeated reliance on the "urinal screen" in the body of the claims or the other indications in the specification supporting the conclusion that the "urinal screen" terms in the preambles are limiting.  Rather, this language confirms that a person of ordinary skill would distinguish a urinal from a toilet or other bathroom appliance.  In sum, the intrinsic record (including the claim language) requires the conclusion that the "urinal screen" terms in the preamble are limiting.

Moreover, as Fresh Products argues (Dkt. 79 at 13-14; Dkt. 86 at 8), the prosecution history supports this conclusion.  On June 27, 2017, the United States Patent and Trademark Office ("PTO") rejected claims 1 and 11-16 of the '098 patent under 35 U.S.C. § 103 as being unpatentable over U.S. Patent Pub. No. 2014/0259344 to Muderlak et al. in view of U.S. Patent No. 927,026 to Clayton.  (Dkt. 80-6 at 2-6.)  The PTO also rejected claims 2-10 as unpatentable over Muderlak in view of Clayton, further in view of U.S. Patent No. 4,671,976 to Vidal and claims 17-19 as unpatentable over Muderlak in view of Clayton.  (*Id*. at 7-8.)  On September 27, 2017, Fresh Products argued in response that it was improper to combine Clayton and Muderlak for purposes of obviousness because Clayton was not analogous art or in the same field of endeavor as the claims or Muderlak.  (*Id.* at 16.)  Fresh Products further argued that "[t]he field of endeavor for both Muderlak and the present application is apparatuses for use inside of a urinal to reduce splash and/or to screen debris from entering a urinal drain" while "Clayton, on the other hand, discusses a floor for use in a restroom, beneath and **outside** of a urinal" and

16

"discusses sanitary flooring." (*Id.* at 18-20.)  In making this argument, Fresh Products relied in part on the following figure from Clayton:



(*Id.* at 19; *see also* Dkt. 80-7 at 2 (Clayton).)  The object of Clayton's invention was to "obviate" unsanitary floors in "toilet rooms" by "providing a perforated floor with raised knob or small projecting surfaces, and underneath to employ a flushing pan which receives all of the water or urine falling upon the floor and conveys it to the trap and is discharged so that it may be flushed out . . . ."[7]  (Dkt. 80-7, at 1:12-30.)

Vectair responds to this prosecution disclaimer argument in two ways.  (Dkt. 84 at 7-11.)  First, Vectair argues that other products similar to Clayton, such as the Britex SUPERSTEP and SANISTEP urinals, refer to themselves as "urinals."  (*Id.* at 7-8; *see*

---

[7]      In Clayton's figures, the urinal is numbered as 3, the floor as 7, the projecting knobs as 11 and 12, and the pan as 13.  (Dkt. 80-7, at lines 47-63.)

17

*also* Dkt. 78-7 (Britex publication).)  Vectair also contends that statements made by Fresh

Products during the '098 prosecution about Clayton do not amount to an unequivocal

disclaimer because Fresh Products' responses to Office Actions, including its September

27, 2027 Response, contained the following "No Disclaimers or Disavowals" section at

the end:

> ### No Disclaimers or Disavowals
>
> Although the present communication may include alterations to the application or claims, or characterizations of claim scope or referenced art, Applicant is not conceding in this application that previously pending claims are not patentable over the cited references. Rather, any alterations or characterizations are being made to facilitate expeditious prosecution of this application. Applicant reserves the right to pursue at a later date any previously pending or other broader or narrower claims that capture any subject matter supported by the present disclosure, including subject matter found to be specifically disclaimed herein or by any prior prosecution. Accordingly, reviewers of this or any parent, child or related prosecution history shall not reasonably infer that Applicant has made any disclaimers or disavowals of any subject matter supported by the present application.

(Dkt. 80-6 at 23.)  According to Vectair, this renders any disavowal by Fresh Products

"equivocal" rather than "unequivocal."  (Dkt. 84 at 10-11.)

"The doctrine of prosecution disclaimer precludes patentees from recapturing

through claim interpretation specific meanings disclaimed during prosecution."  *Mass.

Inst. of Tech. v. Shire Pharms., Inc.*, 839 F.3d 1111, 1119 (Fed. Cir. 2016) (citation

modified).  "In order for prosecution disclaimer to attach, the disavowal must be both

clear and unmistakable."  *Id.* (citation modified).  Where "the alleged disavowal is

ambiguous, or even amenable to multiple reasonable interpretations, [courts] have

declined to find prosecution disclaimer."  *Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d

1040, 1045 (Fed. Cir. 2016) (citation modified); *see also Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1374 (Fed. Cir. 2022) ("For a statement during prosecution to qualify as a disavowal of claim scope, it must be so clear as to show reasonable clarity and deliberateness, and so unmistakable as to be unambiguous evidence of disclaimer." (citation modified)).

Here, Fresh Products did not describe Clayton's features without relying on those features to distinguish the proposed claims of the application resulting in the '098 patent. *See Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1375 (Fed. Cir. 2008) ("Prosecution disclaimer does not apply, for example, if the applicant simply describes features of the prior art and does not distinguish the claimed invention based on those features."). Fresh Products relied on the fact that Clayton's invention was for "a floor for use in a restroom, beneath and **outside** of a urinal," while the claims presented to the PTO were directed to an invention for "use inside of a urinal." (Dkt. 80-6 at 20.) In doing so, Fresh Products disclaimed certain scope insofar as the claimed "urinal screen" is not for use outside of a urinal. This is reinforced by the Interview Summary of a May 10, 2018 interview between the patent examiner and the applicant's representative, during which they agreed that "Clayton discloses a floor, not a urinal screen." (*Id.* at 24.)

The Court finds Vectair's reliance on the "No Disclaimers or Disavowals" section similarly unpersuasive. To the extent Vectair argues this language is intended to preclude a court from finding prosecution disclaimer, the Court has serious doubts as to whether a patentee can avoid such a finding in this manner. More importantly, when read in context, the "No Disclaimers or Disavowals" section only seeks to make clear that

19

concessions made by the applicant to obtain claims during that prosecution do not preclude the applicant from seeking patent protection for other subject matter "supported by the present application" in **another** prosecution.  The Court finds this language does not render equivocal Fresh Products' disclaimer of uses outside of a urinal, particularly given the language distinguishing Clayton in the Response and the patent examiner's acceptance of this distinction (as noted in the Interview Summary).

Finally, Vectair relies on extrinsic evidence establishing "that a 'urinal screen' is usable in sinks or other non-urinal fixtures with drains."  (Dkt. 69 at 18.)  The Court is not persuaded, including because such extrinsic evidence is less significant than and cannot overcome the intrinsic evidence supporting the conclusion that the "urinal screen" recited in the preambles is limiting.  *See Interactive Gift Express*, 256 F.3d at 1331; *Phillips*, 415 F.3d at 1317.

For all of these reasons, the Court finds that the "urinal screen" terms in the preambles are limiting.

Vectair also argues that the word "reversible" in the preamble is not limiting because it merely "extols a usage benefit rather than reciting a structural element of the claimed apparatus."  (Dkt. 69 at 18; *see also* Dkt. 84 at 11.)  The Court disagrees.  For example, claim 1 of the '924 patent claims a "reversible urinal screen" where the last three limitations recite:

> **when the reversible urinal screen is placed upon the urinal surface in a first orientation**, a first plurality of tips of the plurality of posts support the plurality of braces above the urinal surface, and a second plurality of tips of the plurality of posts are positioned above the plurality of braces, and

> **when the reversible urinal screen is placed upon the urinal surface in a second orientation**, the second plurality of tips of the plurality of posts support the plurality of braces above the urinal surface, and the first plurality of tips of the plurality of posts are positioned above the plurality of braces, and
>
> **wherein at least some of the plurality of braces comprise contoured upper and lower surfaces to deflect urine when the reversible urinal screen is placed upon the urinal surface in either of the first or second orientations**.

('924 patent, claim 1.)

This language (and similar language in the other claims directed to a "reversible urinal screen") clearly links structural elements—the plurality of posts and their tips as supporting braces having contoured upper and lower surfaces—to the fact that the urinal screen deflects urine when "placed upon the urinal surface in either of the first or second orientations." This confirms the limiting nature of the "reversible" term in the preamble.

Finally, other district courts have found that the term "urinal screen" in the preamble was limiting because it was necessary to give meaning to the claims. (Dkt. 80-8 at 3-4; Dkt. 80-9 at 5.) While not binding authority, they support the Court's independent conclusion based on the arguments presented in this action that these preamble terms are limiting. *See NUTech Ventures v. Syngenta Seeds, Inc.*, 984 F. Supp. 2d 957, 967 (D. Neb. 2013) ("Therefore, although prior claim construction rulings with respect to the same patent-in-suit may not be binding on the Court, they will generally be entitled to reasoned deference under the broad principals [sic] of stare decisis and the goals articulated by the Supreme Court in *Markman*, even though stare decisis may not be applicable per se." (citation modified)).

21

## 2.      Claim Construction

Having found that the "urinal screen" and "reversible urinal screen" terms in the preambles are limiting, the Court turns to their claim construction. Fresh Products argues that the terms are straightforward and easy to understand such that there is no need for the Court to impose a definition beyond their ordinary meaning. (Dkt. 79 at 15-16.) Vectair contends that its proposed constructions are appropriate because they are "adapted from the specification and general dictionaries" and points out that the utility patents describe fluids other than urine (water, discarded beverages, etc.) passing through such screens. (Dkt. 69 at 18-19.) Vectair also seeks a construction of "reversible" as meaning "having two finished usable sides." (*Id.* at 17.)

As to the term "urinal screen," at times, claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. This is one of those times. The Complaint states that "[u]rinal screens are widely used as air fresheners and to prevent debris from being flushed down a urinal drain." (Dkt. 1 ¶ 8.) This supports the conclusion that persons of ordinary skill in the art understand what a "urinal screen" is. Indeed, Vectair's marketing materials use the term "urinal screen." (*E.g.*, Dkts. 78-37, 78-38.) The Court is reasonably confident that a jury in this case would include persons who have previously encountered a urinal screen and sees no reason to elaborate on the meaning of a term used to describe products that (as Vectair alleges in its Complaint) are "widely used." *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify

and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.  It is not an obligatory exercise in redundancy.”).

The term “reversible” requires slightly more discussion.  Fresh Products contends that if the Court finds this term requires further construction, the Court should construe it to mean “adapted to be reversed such that either side is usable as the top or bottom side.” (Dkt. 79 at 16.)  Vectair responds that the “top” and “bottom” sides proposed by Fresh Products lack any explanation and, citing a reference that discusses installation of a urinal screen on the back wall of a urinal, argues that “[s]ome urinal screens are arranged vertically rather than horizontally,” meaning that “reversible,” standing alone, does not justify “reading-in a horizontal arrangement limitation.”  (Dkt. 69 at 19.)

The “reversible” term appears in the claims of the ’924 and ’745 patents.  The specification states:

> In some embodiments, the urinal screen 10 is configured such that a plurality of posts 22 space the frame 14 from the installation surface of a urinal or other fixture onto which the urinal screen 10 is installed. **The posts 22 space the frame 14 from the installation surface independent from the orientation of the urinal screen 10**. For example, the second plurality of posts 22b can form a base of the urinal screen 10 and can space the frame 14 from the installation surface when the screen 10 is installed with the second surface 30 of the frame 14 facing the installation surface. On the other hand, the first plurality of posts 22a can form a base of the urinal screen 10 and can space the frame 14 from the installation surface when the screen 10 is installed with the first surface 26 of the frame facing the installation surface.

(’924 patent, at 6:58-7:4 (emphasis added); *see also* ’745 patent, at 6:58-7:4 (same).)

The Abstract states: “In some embodiments, posts extend from a first face and a second face of the frame” and Figure 5 depicts the urinal screen 10 having a frame 14

with posts 22a on one face and posts 22b on the opposite face. (*E.g.*, '924 patent, at [57] & Fig. 5.) The Summary of the Invention states:

- "In some cases, the screen includes a plurality of first posts extending from the first face of the frame. The screen can include a plurality of second posts extending from the second face of the frame."

- "According to some variants, a urinal screen includes a frame. The frame can have: a first face; **a second face opposite the first face**; and a plurality of openings extending through the frame between the first face and the second face. The urinal screen can include a plurality of first posts extending from the first face of the frame. In some embodiments, the urinal screen includes a plurality of second posts extending from the second face of the frame. **In some embodiments, a plurality of ends of the plurality of second posts form a base upon which the urinal screen rests when the plurality of first posts point away from a surface upon which the urinal screen is set**."

('924 patent, at 1:29-33, 2:19-31 (emphases added).)

All of this is consistent with the description of the "first orientation" and "second orientation" of the urinal screen's placement in the claims of the '924 patent and the placement of the "first face" and "second face" (described as "opposite" to each other) relative to the "urinal surface" in the claims of the '745 patent. (*E.g.*, '924 patent, at 8:6-26, 9:44-10:11, 10:59-11:20; '745 patent, at 7:66-67, 8:10-27, 9:27-28, 9:42-10:13.)

In sum, it is clear that the claimed reversibility corresponds to the fact that the urinal screen has two opposite faces, where posts (or protrusions) extend from each face and the posts on these opposing faces form a base on which the urinal screen rests when placed in the urinal regardless of which of the opposing faces is placed on the urinal surface. That said, given the detailed description of the structural relationship between the various surfaces and the posts (or protrusions) in the claims themselves, it is unclear

24

why any construction of "reversible" is necessary.  To the extent Vectair proposes "having two finished usable sides" as a construction for this term, the Court rejects this construction because the term "finished" lacks any connection to the intrinsic record. Finally, neither party has articulated any reason why the infringement or invalidity analysis requires construction of "reversible."  Based on the current record, there is no need (or good reason) to further define "reversible," and the Court therefore construes this term as having its plain and ordinary meaning.

## B.      "Surface Area" Terms

Claims 1, 13, 15, and 48-50 of the '098 patent recite the term "surface area of the frame as observed perpendicular to."  ('098 patent, claims 1, 13, 15, and 48-50.)  Claims 24 and 31 of the '924 patent recite the term "surface area of the urinal screen as observed perpendicular to."  ('924 patent, claims 24 and 31.)  Claims 1, 2, 15, and 16 of the '745 patent recite the term "overall surface area of the flexible frame as viewed normal to." ('745 patent, claims 1, 2, 15 and 16.)  Vectair contends these terms are indefinite and, in the alternative, proposes certain constructions for those terms.  (Dkt. 69 at 19-26; Dkt. 84 at 11-14.)  Fresh Products responds that the terms are not indefinite, no construction is needed, and, if any construction is needed, all three terms should be construed as "the surface area of the frame as observed perpendicular to the first face when the frame is set on a flat surface."  (*E.g.*, Dkt. 79 at 17-22; Dkt. 86 at 12-16.)  The parties' respective positions for the three "surface area" terms are reproduced in the following table.

25

| Claim Term | Patent Claim(s) | Vectair's Proposed Construction | Fresh Products' Proposed Construction |
|---|---|---|---|
| "surface area of the frame as observed perpendicular to" | '098 patent, claims 1, 13, 15, and 48-50 | Indefinite<br><br>If amenable to construction:<br><br>"exposed surface area of the entire frame (but not including portions covered or overlaid by posts, protrusions, or other structures)"<br><br>Alternatively:<br><br>"the surface area of the visible portion of the frame as observed perpendicular / orthogonal / at right angles to" | Plain and ordinary meaning<br><br>If further defined, "the surface area of the frame as observed perpendicular to the first face when the frame is set on a flat surface" |
| "surface area of the urinal screen as observed perpendicular to" | '924 patent, claims 24 and 31 | Indefinite<br><br>If amenable to construction:<br><br>"exposed surface area of the entire urinal screen"<br><br>Alternatively:<br><br>"the surface area of the visible portion of the urinal screen as observed perpendicular / orthogonal / at right angles to" | Plain and ordinary meaning<br><br>If further defined, "the surface area of the frame as observed perpendicular to the first face when the frame is set on a flat surface" |

| Claim Term | Patent Claim(s) | Vectair's Proposed Construction | Fresh Products' Proposed Construction |
|---|---|---|---|
| "overall surface area of the flexible frame as viewed normal to" | '745 patent, claims 1, 2, 15 and 16 | Indefinite<br><br>If amenable to construction:<br><br>"exposed surface area of the entire flexible frame (but not including portions covered or overlaid by posts protrusions, or other structures)"<br><br>Alternatively:<br><br>"the surface area of the visible portion of the frame as observed perpendicular / orthogonal / at right angles to" | Plain and ordinary meaning<br><br>If further defined, "the surface area of the frame as observed perpendicular to the first face when the frame is set on a flat surface" |

### 1.    Indefiniteness

Vectair makes several arguments why the "surface area" terms are indefinite.

First, relying on the Declaration of Richard W. Klopp, Ph.D., P.E., F.A.S.M.E., Vectair

argues that the surface area terms are indefinite because "two materially different types of

measurements [of the claimed surface areas] are possible, rendering the terms indefinite."

(Dkt. 69 at 21-26 (citing Dkt. 72 ("Klopp Decl." or "Klopp Declaration")).)  According to

Vectair, this is for several reasons: (1) it is unclear whether the area being measured is the

physical surface area (the "skin") of the three-dimensional urinal screen or its frame or a

two-dimensional "projected" surface area (*id.* at 21-22); (2) the fact that some of the

claimed "posts" and "protrusions" are angled makes the "measurement boundaries"

27

unclear because the openings in the frame will look different depending on the viewing/observation angle (*id.* at 22); and (3) the "frames" recited in the '098 and '745 patents raise further confusion, including due to the posts/protrusions (*id.* at 23-26).

Fresh Products responds that the "surface area" terms are not indefinite and are not susceptible to multiple meanings when read in light of the specification and the claim language. (Dkt. 79 at 18-22.) According to Fresh Products, "the claims convey" that when the urinal screen is observed perpendicular to a flat surface when placed on that flat surface, that "the urinal screen or frame has a surface area, and the openings occupy a given percentage of that surface area." (*Id.* at 21.)

As the Federal Circuit has explained, "a claim may be invalid as indefinite when (1) different known methods exist for calculating a claimed parameter, (2) nothing in the record suggests using one method in particular, and (3) application of the different methods result in materially different outcomes for the claim's scope." *Saso Golf, Inc. v. Nike, Inc.*, 843 F. App'x 291, 296 (Fed. Cir. 2021) (quoting *Ball Metal Beverage Container Corp. v. Crown Packaging Tech., Inc.*, No. 2020-1212, 838 F. App'x 538, 542 (Fed. Cir. Dec. 31, 2020)). With this principle in mind, the Court reproduces the "surface area" terms below.

For the '098 patent, the "surface area" terms in claims 1, 13, 15, and 48-50 are reproduced below:

> 1. . . . wherein the **plurality of openings occupy** at least half of a **surface area of the frame** as observed perpendicular to the first face of the frame when the frame is set on a flat surface.

('098 patent, at 8:7-10.)

13. The urinal screen of claim 1, wherein the **plurality of openings occupy** at least 75% of the surface area of **the frame** as observed perpendicular to the first face of the frame when the frame is set on a flat surface.

('098 patent, at 9:7-10.)

15. The urinal screen of claim 1, wherein perimeter structures that define the **plurality of openings occupy** less than one fifth of a surface area **of the frame** as observed perpendicular to the first face of the frame when the frame is set on a flat surface.

('098 patent, at 9:14-18.)

48. The urinal screen of claim 38, wherein the **plurality of openings occupy** at least half of a surface area **of the frame** as observed perpendicular to the first face of the frame when the frame is set on a flat surface.

49. The urinal screen of claim 38, wherein the **plurality of openings occupy** more than ⅔ of a surface area **of the frame** as observed perpendicular to the first face of the frame when the frame is set on a flat surface.

50. The urinal screen of claim 38, wherein **the plurality of openings occupy** at least ¾ of a surface area **of the frame** as observed perpendicular to the first face of the frame when the frame is set on a flat surface.

('098 patent, at 12:19-31.)

For all of these claims in the '098 patent, the "frame" is an element of the claimed "urinal screen," the "faces" are elements of the "frame," and the "openings" extend "through the frame between the first face and the second face." ('098 patent, at 7:64-8:2.)

For the '924 patent, the "surface area" terms in claims 24 and 31 are reproduced below:

24. . . . wherein **the tessellation of openings comprise at least half of a surface area** of the urinal screen as observed perpendicular to a flat surface when the urinal screen is placed on the flat surface.

29

('924 patent, at 10:32-35.)

> 31. The reversible urinal screen of claim 28, wherein the **tessellation of openings comprise at least half of a surface area** of the urinal screen as observed perpendicular to a flat surface when the urinal screen is placed on the flat surface.

('924 patent, at 12:13-16.)

For all of these claims in the '924 patent, the claimed "reversible urinal screen"

includes a "tessellation of openings" formed by "a plurality of interconnected cells."

('924 patent, at 9:32-34, 10:47-49.)

Finally, for the '745 patent, the "surface area" terms in claims 1, 2, 15, and

16 are reproduced below:

> 1. . . . wherein the **plurality of openings occupy more than** ⅓ of an overall surface area of the flexible frame as viewed normal to a flat surface when the reversible urinal screen is set on the flat surface with the first face facing the flat surface and the second face facing away from the flat surface.

('745 patent, 8:28-33.)

> 2. The reversible urinal screen of claim 1, **wherein the plurality of openings occupy** more than ⅜ of an overall surface area of the flexible frame as viewed normal to the flat surface when the reversible urinal screen is set on the flat surface with the first face facing the flat surface and the second face facing away from the flat surface.

('745 patent, at 8:46-51.)

> 15. . . . wherein the **plurality of openings occupy** more than ⅓ of an overall surface area **of the flexible frame** as viewed normal to a flat surface when the reversible urinal screen is set on the flat surface.

('745 patent, 10:14-17.)

> 16. . . . wherein **the plurality of openings occupy more** than ⅜ of an overall surface area **of the flexible frame** as viewed normal to the flat surface when the reversible urinal screen is set on the flat surface.

30

('745 patent, at 10:22-27.)

For all of these claims in the '745 patent, the claimed "reversible urinal screen" includes a "flexible frame" having first and second opposing faces where the "plurality of openings" are "through the first face and the second face." ('745 patent, at 7:65-8:2, 9:27-32.)

The Court begins with Vectair's first indefiniteness argument, which is that "surface area" terms are ambiguous because it is unclear "whether a *physical* or *projected* 'surface area' measurement is recited." (Dkt. 69 at 21.)  This argument is based on the fact that a non-planar three-dimensional object (such as a three-dimensional urinal screen) has a different physical surface area (i.e., its "skin") than its "projected" surface area (a two-dimensional measurement that could vary based on the viewing angle).  (*Id.*) The problem with this argument is that it ignores the claim language itself, which specifies that the surface area is measured as observed and specifies the observation angle (perpendicular), as well as other intrinsic evidence, and instead relies on Dr. Klopp's opinions and dictionary definitions—both of which are extrinsic evidence.  (*See id.*)

"[T]he use of a term within the claim provides a firm basis for construing the term." *Phillips*, 415 F.3d at 1314.  Here, all of the "surface area" terms state that the surface area is as observed perpendicular (or normal)[8] to a defined physical object—the urinal screen, its frame, or a face of the frame—when the screen or frame is set on a flat

---

[8]    The parties do not dispute that a person of ordinary skill in the art would understand "normal" to mean "perpendicular."

surface.  In other words, the claim language tells a person of ordinary skill in the art that the "surface area" terms refer to what Vectair describes as a "projected" rather than a "physical" measurement and specifies the observation angle.  Moreover, the specification is consistent with this interpretation because it states: "The openings 18 can occupy a large percentage of the **overall surface area** of the frame 14 **as viewed in FIG. 2**," where Figure 2 (reproduced below) is a "top view" (i.e., perpendicular to) the urinal screen.  ('098 patent, at 4:42-43 (emphases added), Fig. 2.)



FIG. 2

This is persuasive evidence that the "surface area" terms describe the surface area as observed from a view perpendicular to the screen (or frame) when it is placed on a flat surface.  *See Phillips*, 415 F.3d at 1315 ("[T]he specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the

meaning of a disputed term.'") (quoting *Vitronics*, 90 F.3d at 1582).  While the Court could make this determination based on the intrinsic evidence alone, the Declaration of Randy Hurd, Ph.D., that "[b]ased on [his] review of the claim language, specification, and patent figures, a person of ordinary skill would understand, with reasonable certainty, that the disputed 'surface area' limitations refer to a 'projected' or 'two-dimensional' surface area, as viewed in Figure 2" supports this conclusion.  (Dkt. 88 ("Hurd Decl." or "Hurd Declaration") ¶ 32.)  In contrast, Vectair ignores the claim language and description of Figure 2 and attempts to create ambiguity based on the Klopp Declaration and dictionary definitions.[9]  (Dkt. 69 at 21.)  This is unpersuasive.  *See Phillips*, 415 F.3d at 1324 (holding that extrinsic evidence is "less significant than the intrinsic record" and should not be "used to contradict claim meaning that is unambiguous in light of the intrinsic evidence").

The claim language and specification also dispose of Vectair's argument that it is unclear how to account for the effect of angled posts/protrusions (shown as 22 in the following reproduction of Figure 6) when measuring surface area.

---

[9]   Vectair also relies on an unrelated Fresh Products patent to support its argument that "surface area" could refer to the physical surface area.  (Dkt. 69 at 21, 23 n.5 (citing Dkt. 78-15, at 2:57-59, which states "Preferably, the protrusions 14 are located substantially across the screen 10, thus increasing its surface area.")); *see also* Dkt. 84 at 12 (same).)  While this confirms that "surface area" could—as a general matter—mean a physical (rather than projected) surface area, this extrinsic evidence has little bearing on the meaning of the "surface area" terms in the utility patents asserted in this action.  As for Vectair's argument relating to the "underlying provisional" (Dkt. 69 at 23 n.5), this argument appears to be based on a theory that the frame "excludes posts/protrusions" but the screen itself does not.  Given the lack of evidentiary support that a person of ordinary skill in the art would read the claims as such (*see id.* at 23-24), the Court does not give this minimally articulated argument much weight.



**FIG. 6**

('098 patent, at Fig. 6.)  According to Vectair, the view of the openings and the frame

"could" be obscured or change depending on the observation angle if the urinal screen is

opaque.  (Dkt. 69 at 22.)  But this argument ignores the fact that the claim language itself

states the observation angle—it is perpendicular to the screen or frame when on a flat

surface—and that the surface area is measured based on that angle (which is also

confirmed by the specification).  The surface area measurement based on other

observation angles is not relevant.  Vectair also argues indefiniteness based on arguments

about what "overall surface area" means and which "faces/sides of a 'frame' or 'urinal

screen'" should be measured, including whether they can be seen due to a transparent or

translucent material.  (Dkt. 69 at 21-22.)  These arguments appear to be based on the

alleged ambiguity of whether the measurement is physical or projected, and those

questions are resolved by the intrinsic evidence showing the surface area is measured as

observed at a perpendicular angle.

Next, Vectair asks a series of questions intended to show that the "surface area"

terms are ambiguous (and therefore indefinite), including whether the surface area of a

frame covered by a post/protrusion should be measured because the posts/protrusions

"are not unambiguously part of the frame," whether the physical surface area of the

34

posts/protrusions should be measured as part of the frame, and whether the frame or urinal screen is a unitary structure. (Dkt. 69 at 23-26; *see also* Dkt. 84 at 12-13.) The fact that Vectair can pose questions about how the "surface area" terms **could** be interpreted falls well short of proving by clear and convincing evidence that the terms are indefinite. *See ClearOne, Inc. v. Shure Acquisition Holdings, Inc.*, 35 F.4th 1345, 1351 (Fed. Cir. 2022) ("ClearOne's arguments for indefiniteness merely identify different ways one could interpret self-similar. Just because a term is susceptible to more than one meaning does not render it indefinite. 'Such a test would render nearly every claim term indefinite so long as a party could manufacture a plausible construction.'") (quoting *Nevro Corp. v. Bos. Sci. Corp.*, 955 F.3d 35, 41 (Fed. Cir. 2020)). Further, many of these questions are answered based on the intrinsic record demonstrating that the "surface area" terms are to be measured based on observation, and they are all unsupported by persuasive evidence (at times, by any evidence) that a person of ordinary skill in the art would not understand how to measure the surface area of the screen or frame as recited in the claims. Given the fact that Figure 2 and the language describing it suggests that the relevant measurement is how much of the frame is open (*see* '098 patent, at Fig. 2 & 4:42-49), and that Vectair has not shown that including or excluding the areas beneath or hidden by posts/protrusions would "result in materially different outcomes for the claim's

35

scope," Vectair has not shown that the difference in such measurements renders the "surface area" terms indefinite.[10]  *See Saso Golf*, 843 F. App'x at 296.

For all these reasons, the Court finds that Vectair has failed to meet its burden to show that the "surface area" terms, "viewed in light of the specification and prosecution history," fail to "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 572 U.S. at 910; *see also Nevro*, 955 F.3d at 41 ("The test is not merely whether a claim is susceptible to differing interpretations.  Such a test would render nearly every claim term indefinite so long as a party could manufacture a plausible construction.").

## 2.    Claim Construction

The Court turns to construction of the "surface area" terms.  Vectair's primary proposed constructions use the term "exposed surface area" of the frame, two of those primary constructions exclude the frame's surface area to the extent it is "covered or overlaid by posts, protrusions, or other structures," and Vectair's alternative constructions similarly refer to the "visible portion of the frame."  (Dkt. 69 at 19-20.)  In other words, Vectair seeks a construction that expressly excludes areas directly underneath or in the "shadow" of the posts/protrusions from the calculation of the frame's surface area.  Fresh

---

[10]    Relying on *Saso Golf*, Vectair argues that it is "unclear where boundaries are located to take a claimed measurement."  (Dkt. 69 at 20.)  In *Saso Golf*, however, the calculations "require[d] picking a specific point on the 'toe' and 'heel' [of a golf club head] from which to measure," where the definitions of "toe" and "heel" were disputed, namely "the size, shape, and locations of these regions and where within them to begin measurements are reasonably certain."  843 F. App'x at 293.  Here, the type of measurement (projected) and angle (perpendicular) are ascertainable from the claims.

Products responds that Vectair ignores the figures showing the posts "only as an outline overlying the frame," which Fresh Product contends show the goal of the "surface area" terms "is to specify the portion of the frame occupied by openings." (Dkt. 86 at 16 (citing '098 patent, Fig. 2).) Fresh Products further argues: "It makes no sense that the portion occupied by openings would change based on the number of posts extending from the frame as would be the case with Vectair's proposed construction." (*Id.*)

The Court rejects Vectair's proposed constructions because Vectair has not identified any language in the claims or specification suggesting that the area of the frame covered by the posts/protrusions should be excluded or the surface area should be limited to the "visible portion of the frame." The Court agrees with Fresh Products that the intrinsic record suggests the relevant measurement is the observed surface area of the openings compared to the frame's surface area. Vectair also has not explained how its proposed constructions would "clarify" or are "necessary to explain what the patentee covered by the claims, for use in the determination of infringement." *See U.S. Surgical*, 103 F.3d at 1568. The Court finds that no construction of the "surface area" terms is necessary and gives them their plain and ordinary meaning.

## C.    "Reduce Splashing" Terms

Claims 38 and 54 of the '098 patent recite "such that the posts positioned between the frame and the surface upon which the urinal screen is set can reduce splashing" and "wherein the plurality of openings comprise a contoured side surface to further reduce splashing," respectively. ('098 patent, at 11:26-28, 12:49-52.) Claims 21 and 28 of the '924 patent recite "at least a portion of the plurality of posts between the [first/second]

37

plurality of tips and plurality of braces can reduce splashing." ('924 patent, at 9:53-56, 9:66-7:10:2, 11:5-7, 11:14-17.)  Claims 1 and 15 of the '745 patent recite "such that the [first/second] plurality of protrusions can reduce splashing on a user of the urinal."  ('745 patent, at 8:16-18, 8:24-26, 10:2-3, 10:10-12.)  Vectair argues that these "reduce splashing" terms are indefinite, and Fresh Products argues that they are not indefinite and should be given their plain and ordinary meaning.  (Dkt. 68 at 11-14.)  Fresh Products further contends that, "If a term is construed, it should be the entire term in which 'reduce splashing' appears."  (*Id.* at 11.)  The parties' positions are summarized in the following table.

| Claim Term | Patent Claim(s) | Vectair's Proposed Construction | Fresh Products' Proposed Construction |
|---|---|---|---|
| Vectair:<br><br>"reduce splashing"<br><br>Fresh Products:<br><br>The entire term in which "reduce splashing" occurs | '098 patent, claims 38 and 54<br><br>'924 patent, claims 21 and 28<br><br>'745 patent, claims 1 and 15 | Indefinite | Plain and ordinary meaning |

### 1.    Indefiniteness

To put Vectair's indefiniteness arguments in context, the "reduce splashing" terms are "terms of degree" in that they "necessarily call[] for a comparison against some baseline." *Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388, 1395-96 (Fed. Cir. 2016), *cert. denied*, 581 U.S. 940 (2017).  Vectair's indefiniteness arguments can be

summarized as follows: (1) "reduce splashing" is indefinite because there is no objective baseline or benchmark for comparison (in other words, it is unclear how one would know if splashing is reduced) and (2) different tests for whether splashing is reduced may yield different results.  (Dkt. 69 at 26-31; Dkt. 84 at 14.)  Fresh Products responds that a person of ordinary skill in the art[11] would understand that the "features of the claimed urinal screen can reduce splashing associated with the use of a urinal" (Dkt. 79 at 24), further clarifying that the "features" are the posts and protrusions of claims 38 of the '098 patent, claims 21 and 28 of the '924 patent, and claims 1 and 15 of the '745 patent; and the contoured side surface of claim 54 of the '098 patent (Dkt. 86 at 16).  Fresh Products also responds that a dispute over test methods does not support a conclusion of indefiniteness. (*Id.* at 19.)

Beginning with Vectair's first argument, "[t]erms of degree are problematic if their baseline is unclear to those of ordinary skill in the art." *Liberty Ammunition*, 835 F.3d at 1395.  "[C]laims having terms of degree will fail for indefiniteness unless they 'provide objective boundaries for those of skill in the art' when read in light of the specification and the prosecution history." *Id.* at 1396 (quoting *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370-71 (Fed. Cir. 2014)).  However, "a patentee need not define [the] invention with mathematical precision in order to comply with the definiteness requirement." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377

---

[11]    Vectair takes issue with Fresh Products' inclusion of "one to two years of experience with the design or testing of splash reduction methods and devices" in its definition of a person of ordinary skill in the art. (*See* Dkt. 84 at 5.)  But Vectair does not elaborate on why this matters, so the Court does not decide this issue in this Order.

(Fed. Cir. 2017) (quoting *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1384 (Fed. Cir. 2005)).  Moreover, what can be seen by the normal human eye" may provide "an objective baseline through which to interpret the claims."  *Sonix Tech.*, 844 F.3d at 1378.

*Liberty Ammunition* is instructive.  In *Liberty Ammunition*, the Federal Circuit addressed a claim for a bullet with a "reduced area of contact."  835 F.3d at 1395-96. Noting that the term "reduced area of contact" called for a comparison, the Federal Circuit acknowledged that the claim did not provide any clues "as to what the area of contact has been reduced *from*."  *Id.* at 1396 (quoting *Liberty Ammunition, Inc. v. United States*, 119 Fed. Cl. 368 (2014)), *aff'd in part, vacated in part, rev'd in part,* 835 F.3d 1388 (Fed. Cir. 2016).  The Federal Circuit turned to the specification and determined that a specific bullet, referenced in the specification, was the proper point of comparison, avoiding indefiniteness.  *Id.*

Here, the claim language recited above shows that the "reduced splashing" results from specific claimed structure, namely the posts, protrusions, and contoured surfaces. The specification further states as to the contoured surfaces:

> In some cases, the sides **42** and/or corners **46** of the openings **18** have contoured (e.g., convex) upper and/or lower surfaces. The contoured surfaces of the sides **42** and corners **46** can deflect fluid (e.g., urine) to reduce splash in the urinal, toilet, or other environment in which the urinal screen **10** is installed.

('098 patent, at 5:4-9.)  In other words, sometimes the openings have sides or corners (or both) that have contoured upper and/or lower surfaces which can deflect fluid to reduce splashing.

40

As to the posts, the specification states that in some embodiments, the screen is configured such that a plurality of posts space the frame from the surface where the urinal is installed and:

> In some embodiments, the posts **22** positioned between the frame **14** and the installation surface can reduce splashing in the urinal by deflecting urine or other fluids which pass between the frame **14** and the installation surface (e.g., fluid that passes through the openings **18** or around the perimeter of the frame **14**).

('098 patent, at 6:58-60, 7:14-19.)  In other words, sometimes the urinal screen includes posts between the frame and the installation surface that can reduce splashing.

This language indicates that the baseline or comparator for the "reduce splashing" terms is a urinal screen not having the structure required by the claims to reduce splashing, i.e., posts, protrusions, or contoured surfaces of the openings, depending on the claim.  For example, a urinal screen having posts positioned as claimed would have reduced splashing compared to a screen without such posts.  This is confirmed by the opinions of Dr. Hurd, reproduced below.

> 36. I disagree that a [person of ordinary skill in the art] would not understand the "standard against which the reduction is measured." Each of the above limitations recites a feature that can reduce splashing. A [person of ordinary skill in the art] would understand that each claimed feature can "reduce splashing" *as compared to without such feature*.

> 37. For example, a [person of ordinary skill in the art] would understand that the claimed posts can reduce splashing—relative to without such posts—because the claimed posts (1) space the urinal screen from the urinal, which can reduce splashing caused by urine directly impinging the urinal surface, (2) break up the impinging stream of urine impacting the urinal screen from above, and (3) deflect urine that has passed through the openings of the urinal screen. Thus, the claimed posts can reduce splashing.

41

38. Similarly, a [person of ordinary skill in the art] would understand that the claimed "contoured" surface can reduce splashing—relative to without such contoured surface—because the claimed contoured surface (1) can reduce the area perpendicular to the impinging stream of urine impacting the urinal screen and (2) can reduce the angle at which the impinging stream impacts the urinal screen. Thus, the claimed contoured surface can reduce splashing.

(Dkt. 88 ¶¶ 36-38.)

Vectair's evidence to the contrary is the opinion of Dr. Klopp that:

Fresh Products opines that the term "reduce splashing" should be construed as its plain and ordinary meaning. This term appears in '098 Patent claims 38-55, '924 Patent claims 21-33, and '745 Patent, all claims. I disagree because this construction is over-broad and would not help a trier of fact understand the scope of the claims. In particular, "reduce splashing" is indefinite because it places no limits on the amount of reduction required to meet the claim, nor does it define the standard against which the reduction is measured.

(Dkt. 72 ¶ 45.)

Dr. Klopp's conclusory opinion is insufficient to support a finding of indefiniteness for several reasons. First, "a claim is not indefinite just because it is broad." *Niazi Licensing*, 30 F.4th at 1347. Second, Dr. Klopp does not address the specification and claims or explain why, in view of the relevant language, a person of ordinary skill in the art would not understand that the comparator is the absence of the claimed structure that reduces splashing. Third, neither Vectair nor Dr. Klopp addresses the fact that Vectair itself performs splash testing. (*See* Dkt. 90 (email discussing testing, including "Splash Back Reduction Testing"); Dkt. 90-1 (test results documenting "SPLASH BACK" of various products).) While this is extrinsic evidence, it still suggests that persons of ordinary skill in the art understand what it means to reduce splashing in the context of the utility patents.

The Court turns to Vectair's second indefiniteness argument, which basically consists of "hypothetical[s]" intended to show that different tests could result in different measures.  (Dkt. 69 at 29-31.)  None of these hypotheticals—which are overwhelmingly attorney argument—appear to be based on the experience of a person of ordinary skill in the art.  Moreover, "disagreements with regard to testing are more appropriately addressed in the context of an infringement analysis."  *3M Innovative Props. Co. v. GDC, Inc.*, 109 F. Supp. 3d 1115, 1121 (D. Minn. 2015) (collecting cases).  The fact that Vectair can imagine a variety of tests that could result in different measurements of splashing is insufficient to show indefiniteness.  Vectair also attempts to create ambiguity by positing a conflict between "acceptable deflection" of fluid and "undesired splashing."  (*See* Dkt. 69 at 28.)  The Court sees no conflict, as the claims do not require "acceptable deflection."  For all these reasons, the Court concludes that Vectair has not met its burden of clear and convincing evidence to show the "reduce splashing" terms are indefinite.

### 2.    Claim Construction

Turning to construction of the "reduce splashing" term, Fresh Products proposes no construction other than "plain and ordinary meaning."  Vectair did not propose any construction as an alternative to its indefiniteness arguments.  The Court concludes that the "reduce splashing" terms are readily understandable to a person of ordinary skill in the art, and need not be construed.  *See U.S. Surgical*, 103 F.3d at 1568 ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.  It is not an obligatory exercise in redundancy.").

## D.    "Contoured" Terms

Claim 54 of the '098 patent recites a "contoured side surface." ('098 patent, at 12:50.) Claims 1 and 21 of the '924 patent recite "contoured upper and lower surfaces." ('924 patent, at 8:22-26, 10:8.) Vectair asserts that these terms are indefinite and that claim 54 is in "improper dependent form under § 112(d)." (Dkt. 68 at 14.) In the alternative, Vectair proposes constructions (set forth in the following table) for these terms. (*Id.*) Fresh Products argues that the terms are not indefinite and that no construction is necessary. (*Id.*) In the alternative, Fresh Product proposes "non-planar" as a construction for "contoured." (*Id.*)

| Claim Term | Patent Claim(s) | Vectair's Proposed Construction | Fresh Products' Proposed Construction |
|---|---|---|---|
| "contoured side surface" | '098 patent, claim 54 | Indefinite and/or improper dependent form under § 112(d)<br><br>If amenable to construction:<br><br>"when the overall urinal screen is oriented horizontally, a contoured side surface is a side-facing surface along one of the openings that is not vertically planar" | Plain and ordinary meaning<br><br>If "contoured" is further construed, "non-planar" |
| "contoured upper and lower surfaces" | '924 patent, claims 1, 21 | If amenable to construction:<br><br>"when the overall urinal screen is oriented horizontally, contoured upper and lower surfaces are uppermost and lowermost surfaces of braces that are not horizontally planar" | Plain and ordinary meaning<br><br>If "contoured" is further construed, "non-planar" |

44

1.    **Indefiniteness**

Vectair contends that the "contoured" terms are indefinite for several reasons. First, the specification does not expressly define "contoured," and, according to Vectair, the specification and drawings of the utility patents and the provisional application to which they claim priority provide no guidance. (Dkt. 69 at 32.) Then, relying on dictionary definitions and a case construing "contoured" for an unrelated patent directed to a kayak, Vectair argues that "contour" is defined "as a shape defined in relation to something else." (*Id.* at 33-35 & n.8 (citing *Old Town Canoe Co. v. Glenwa, Inc.*, 229 F. Supp. 2d 1151, 1158 (D. Or. 2002)).)[12]  According to Vectair, this renders the "contoured" terms here indefinite "because urine is a liquid, and liquids have no fixed shape but instead flow to take the shape of their container." (*Id.* at 34-35.) Next, relying on a definition of "contour" from a technical dictionary, Vectair argues that "contour" only "refers to an inherent quality of any object" and "does not specify any particular shape or configuration." (*Id.* at 35.) Finally, Vectair points to statements made by one of the inventors of the Patents at Issue in an email that "'contoured' means 3D bending of braces of a frame when placed in a particular urinal (which depends on varying installation conditions and screen flexibility) rather than a non-planar surface shape of those braces" as confirming that there is no plain and ordinary meaning to "contoured." (*Id.* at 36.)

---

[12]    The Federal Circuit found this construction was incomplete and further construed the term as "a surface shaped to fit the outline or form of something *concave or similarly at least partially rounded*." *See Old Town Canoe Co. v. Glenwa, Inc.*, 55 F. App'x 918, 922-23 (Fed. Cir. 2003).

45

The Court begins where claim construction should begin, with the intrinsic record. *See Phillips*, 415 F.3d at 1317. Claim 54 of the '098 patent recites:

> 54. The urinal screen of claim 38, wherein the plurality of openings comprise a contoured side surface to further reduce splashing on the user of the urinal by deflecting a flow of urine.

('098 patent, at 12:48-51.) Claims 1 and 21 of the '924 patent similarly recite that the "the plurality of braces comprise contoured upper and lower surfaces to deflect urine" when the urinal screen is placed on the urinal surface. ('924 patent, at 8:22-23,10:7-8.) From this language it is clear that the "contoured side surface[s]" of the openings and "contoured upper and lower surfaces" of the braces have the effect of deflecting urine and, in the case of the '098 patent, deflecting urine to further reducing splashing.

> The specification states as follows with respect to "contoured":

> **In some cases**, the sides 42 and/or corners 46 of the openings 18 have **contoured (e.g., convex) upper and/or lower surfaces**. The contoured surfaces of the sides 42 and corners 46 can deflect fluid (e.g., urine) **to reduce splash** in the urinal, toilet, or other environment in which the urinal screen 10 is installed.

(Dkt. 78, 5:4-9 (emphases added).)

According to Vectair, "This means some but not all embodiments are convex and unspecified non-convex embodiments are possible." (Dkt. 69 at 32 (citing Klopp Decl. ¶ 46).) Fresh Products does not appear to disagree that "contoured" can include "convex" surfaces. That "contoured" surfaces include "convex" surfaces is confirmed by claims 4 and 27 of the '924 patent, which recite:

> The reversible urinal screen of claim [1/21], **wherein the contoured upper and lower surfaces comprise convex surfaces**.

46

('924 patent, 8:35-37; 10:44-46 (emphasis added).)  The fact that dependent claims further specify the "contoured upper and lower surfaces comprise convex surfaces" creates a presumption that "contoured" both includes and is broader than "convex."  *See Seachange Int'l*, 413 F.3d at 1368 ("The doctrine of claim differentiation stems from the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope." (citation modified)).  This intrinsic evidence suggests that "contoured" refers to a fixed shape and includes convex shapes (which are non-planar).

However, Dr. Klopp contends: "The embodiment depicted in '098 Patent Fig. 1 **seems to show** that the openings have flat side surfaces."  (Dkt. 72 ¶ 46 (emphasis added) & Fig. 5 (citing '098 patent, Fig. 1).)  Fresh Products responds that, on the contrary, Figures 1 and 2 depict "contoured surfaces" to reduce splash.  (Dkt. 86 at 20 (citing '098 patent, Figs. 1 & 2).)  The Court reproduces Figures 1 and 2, as annotated in Fresh Products' brief, below.



'098 patent, Fig. 1 (as annotated and cropped by Fresh Products)



Fig. 2

'098 patent, Fig. 2 (as annotated and cropped by Fresh Products)

The Court agrees that Figures 1 and 2 of the utility patents show openings having sides (braces) that are not (as Dr. Klopp suggests) flat. This conclusion is supported by the specification, which states:

48

As illustrated in FIGS. 2 and 3, one or more of the openings 18 (e.g., cells) can have a perimeter which includes a **plurality of sides (e.g., braces) 42 and corners** 46. In some cases, all or a portion of the frame 14 forms a tessellation of openings 18 wherein a plurality of the sides 42 of the openings 18 are shared between two or more openings 18. In some embodiments, each of the openings 18 shares at least one side and at least one corner with another opening.

In some cases, the sides 42 and/or corners 46 of the openings 18 have **contoured** (e.g., **convex**) upper and/or lower surfaces. **The contoured surfaces of the sides 42 and corners 46** can deflect fluid (e.g., urine) to reduce splash . . . .

('098 patent, at 4:63-5:8 (emphases added).)

In sum, Dr. Klopp's opinion that Figure 1 "seems to show" flat side surfaces is unpersuasive, as is Vectair's argument that the specification and figures provide no guidance as to the meaning of the "contoured" term. Rather, they instruct that "contoured" includes convex shapes and that the contouring can deflect fluid to reduce splashing.

Vectair's reliance on dictionary definitions to support its indefiniteness arguments (*see* Dkt. 69 at 32-35) is similarly unpersuasive. While judges are free to consult dictionaries when construing claims, dictionaries remain extrinsic evidence that cannot contradict the intrinsic record. *See Phillips*, 415 F.3d at 1317-24 (discussing role of dictionaries in claim construction). As the Federal Circuit has explained, "[t]he main problem with elevating the dictionary to such prominence is that it focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id.* at 1321. That problem is illustrated here. Vectair relies on dictionary definitions, including those from Merriam-Webster (*see* Dkt. 78-6 at 7)—to

49

support its contention that "contour" means "a shape defined in relation to something else," and builds an indefiniteness argument from that premise. (Dkt. 69 at 32-35 (citing Dkt. 78-6 at 7).) In doing so, Vectair ignores another definition of "contour" in the same dictionary stating that "contour" can mean a shape that is independent of "something else." (*See* Dkt. 78-6 at 7 (defining "contour" as "an outline especially of a curving or irregular figure").) The Court declines to find indefiniteness based on Vectair's selective reliance on dictionary definitions—whether general or technical.

Also unpersuasive is Vectair's reliance on inventor Jeff Smith's email discussing alleged infringement by an entity other than Fresh Products. (*See* Dkt. 69 at 36; *see also* Dkt. 86 at 21 (describing circumstances of email).) Vectair argues that Smith's email supports a meaning of "contour" that is defined in reference to something else (in the email, the urinal surface), and also relies on this email to support its indefiniteness arguments. But the Federal Circuit has cautioned against relying on an inventor's statement to invalidate claims under Section 112, stating: "It is particularly inappropriate to consider inventor testimony obtained in the context of litigation in assessing validity under section 112, paragraph 2, in view of the absence of probative value of such testimony." *Solomon v. Kimberly-Clark Corp.*, 216 F.3d 1372, 1379 (Fed. Cir. 2000). Indeed, inventor testimony is extrinsic evidence, and carries less weight than the intrinsic record. *See Phillips*, 415 F.3d at 1317. Here, while Smith's statement shows that "contoured" could have a meaning other than that proposed by Fresh Products here, that is not enough to show indefiniteness given the intrinsic record. *See ClearOne*, 35 F.4th at

50

1351 ("Just because a term is susceptible to more than one meaning does not render it indefinite.").

Finally, Dr. Klopp opines that "[a]ny surface can deflect fluid." (Dkt. 72 ¶ 46.) In response, Dr. Hurd opined that a person of ordinary skill in the art would understand that a contoured surface is a non-planar surface because such a surface can reduce splashing compared to a flat, planar surface by reducing the area perpendicular to the impinging stream of urine impacting the urinal screen and reducing the angle at which the stream impacts the urinal screen. (Dkt. 88 ¶ 43.) Dr. Hurd cited a journal article relating to "[s]plash-free urinals" to support this opinion. (*Id.* (citing Thurairajah et al., *Splash-free urinals for global sustainability and accessibility: Design through physics and differential equations*, 4 PNAS Nexus 4 (2025) (available at https://academic.oup.com/pnasnexus /article/4/4/pgaf087/8098745 #google_vignette)).) To the extent Vectair relies on Dr. Klopp's opinion to show indefiniteness, the Court is not persuaded for two reasons. First, this "any surface" argument would read the word "contoured" out of the claims. Second, this argument ignores the language in the specification contrasting a "generally planar or flat shape" for the frame with a shape that is "curved or otherwise shaped in a non-planar fashion" and can "**match the contours** of a urinal or toilet." (*See* '098 patent, at 6:26-30 (emphasis added).) While this discussion relates to the frame, it is informative insofar as it distinguishes a flat or planar shape from a curved or otherwise non-planar shape that "matches the contours" of something else. Moreover, Dr. Hurd's opinion—while also extrinsic evidence—is more persuasive

because it is consistent with the intrinsic record and supported by a journal article about reducing splashing in urinals.

For all these reasons, the Court finds that Vectair has not shown by clear and convincing evidence that the "contoured" terms are indefinite.

### 2. Improper Dependent Form

Vectair also argues that claim 54 of the '098 patent violates 35 U.S.C. § 112(d) and therefore is invalid for improper dependent form. (Dkt. 69 at 35, 37.) Section 112(d) states that "a claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed." 35 U.S.C. § 112(d).

Vectair's argument is based on two theories. First, Vectair argues § 112(d) is violated because the definition of "contour" in the McGraw-Hill Dictionary of Scientific and Technical Terms (6th ed.) is "[a] curve drawn up on a two-dimensional diagram through points which satisfy $f(x,y) = c$, where $c$ is a constant and $f$ is some function, such as the field strength for a transmitter." (Dkt. 69 at 35 (citing Dkt. 78-14 at 4).) For the reasons explained above, the Court rejects Vectair's reliance on dictionary definitions, including this mathematical definition, and consequently rejects this improper dependent form argument.

Second, Vectair argues improper dependent form because "contoured side surface" is not used anywhere in the specification, and while the specification uses the term "sides" and refers to "upper and lower surfaces," a "side" is different from "upper" and "lower." (Dkt. 69 at 37.) Vectair also argues that "an opening is a void and voids do

not have a 'surface' as such." (*Id.* (citing Klopp Decl. ¶ 47).) As the Court understands it, Vectair is basically arguing that a person of ordinary skill in the art would not understand the meaning of "wherein the plurality of openings comprise a contoured side surface to further reduce splashing on the user of the urinal by deflecting a flow of urine." (*See* '098 patent at 12:48-51.)

Vectair cites no authority supporting the proposition that every term recited in a patent claim must be found in the specification to avoid invalidity under § 112. As for the argument that openings are voids and voids do not have sides, the specification states that: "In some cases, the sides 42 and/or corners 46 of the openings 18 have contoured (e.g., convex) upper and/or lower surfaces" and "the openings 18 (e.g., cells) can have a perimeter which includes a plurality of sides (e.g., braces) 42 and corners 46." ('098 patent, at 4:63-65, 5:4-6.) Vectair's argument ignores this language defining the openings using sides and surfaces. Vectair has not shown by clear and convincing evidence that a person of ordinary skill in the art would not understand that an opening in a physical object can have a "side surface."

For all these reasons, the Court finds that Vectair has not shown by clear and convincing evidence that claim 54 of the '098 patent is invalid for failure to comply with § 112(d).

### 3.    Claim Construction

The Court turns to whether the "contoured" terms require construction. Vectair contends that construction is necessary to resolve the disputed meaning of "contoured" but does not identify the dispute or explain how its proposed construction would clarify

or is necessary to determining infringement. (*See* Dkt. 69 at 37.) Moreover, Vectair does not explain how the intrinsic record supports its proposed construction of "when the overall urinal screen is oriented horizontally, a contoured side surface is a side-facing surface along one of the openings that is not vertically planar."[13] (*See* Dkt. 69 at 31.)

In the absence of any support for this proposed construction and any explanation of why "contoured" requires construction for purposes of infringement, the Court adopts the plain and ordinary meaning of "contoured." *See U.S. Surgical*, 103 F.3d at 1568. While not dispositive, this independent conclusion based on the arguments presented to this Court is also supported by the fact that another district court adopted plain and ordinary meaning for the term "at least some of the plurality of braces comprise contoured upper and lower surfaces." (*See* Dkt. 80-8 at 6.)

## IV.   LEGAL STANDARD – DESIGN PATENTS

The Patent Act states: "Whoever invents any new, original and ornamental design for an article of manufacture may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 171. "A design patent only protects the novel, ornamental features of the patented design." *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997); *see also Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1293 (Fed. Cir. 2010) ("[A] design patent, unlike a utility patent, limits protection to the ornamental design of the article."). A patentable "design must present an

---

[13]   The Court notes that Vectair's proposed construction, by reciting "not vertically planar," seems to accept that "contoured" means "non-planar."

aesthetically pleasing appearance that is not dictated by function alone." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 148 (1989).

Trial courts must engage in claim construction for design patents, just as they must for utility patents. *Egyptian Goddess Inc. v. Swisa, Inc.*, 543 F.3d 665, 679 (Fed. Cir. 2008). However, neither the Federal Circuit nor the Supreme Court has prescribed a "particular form" that the claim construction must take. *Id.* On the contrary, design patents "typically are claimed as shown in drawings," and that claim construction "is adapted accordingly." *Id.* (citation modified). "As the Supreme Court has recognized, a design is better represented by an illustration 'than it could be by any description and a description would probably not be intelligible without the illustration.'" *Id.* (quoting *Dobson v. Dornan*, 118 U.S. 10, 14 (1886)). The PTO also recognizes that "as a rule the illustration in the drawing views is its own best description." Manual of Patent Examining Procedure ("MPEP") § 1503.01 (8th ed. 2006). That said, a court has discretion to provide verbal elaboration to a design patent if "necessary or helpful." *Egyptian Goddess*, 543 F.3d at 679.

Design patents, like utility patents, are presumed to be valid. *See Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1328 (Fed. Cir. 2015) (citing 35 U.S.C. § 282). Consequently, invalidity of a claim in a design patent must be shown by clear and convincing evidence. *See id.*

## V.    ANALYSIS – DESIGN PATENT

### A.    Invalidity

Vectair argues invalidity for several reasons: (1) indefiniteness because the drawings are "entirely in evenly spaced dashed lines of varying line weights" or illegible; (2) failure to comply with the written description requirement because Fresh Products amended the drawings in an impermissible manner; (3) indefiniteness because the boundaries of the claimed design are indefinite; and (4) indefiniteness and lack of enablement because there are insufficient views of the claimed design.  (Dkt. 69 at 41-55.)  Vectair also argues invalidity because the claimed design is primarily functional rather than ornamental.  (*Id.* at 69-71.)  Fresh Products responds that these invalidity arguments should not be addressed during claim construction, but also responds to Vectair's arguments.  (Dkt. 79 at 32-33; *see also* Dkt. 79 at 33-35 (response).)

As to the relevant legal standards for invalidity, beginning with indefiniteness, "[b]ecause design patent claims are limited to what is shown in the application drawings, there is often little difference in the design patent context between the concepts of definiteness (whether the scope of the claim is clear with reasonable certainty) and enablement (whether the specification sufficiently describes the design to enable an average designer to make the design)."  *In re Maatita*, 900 F.3d 1369, 1375 (Fed. Cir. 2018) (citation modified).  "A visual disclosure may be inadequate—and its associated claim indefinite—if it includes multiple, internally inconsistent drawings."  *Id.*  The ultimate purpose "of § 112's definiteness requirement, then, is to ensure that the disclosure is clear enough to give potential competitors (who are skilled in the art) notice

of what design is claimed—and therefore what would infringe." *Id.* at 1376 (citing

*Carnegie Steel Co. v. Cambria Iron Co.*, 185 U.S. 403, 437 (1902)).  "Thus, a design

patent is indefinite under § 112 if one skilled in the art, viewing the design as would an

ordinary observer, would not understand the scope of the design with reasonable certainty

based on the claim and visual disclosure." *Id.* at 1377.

As to written description, the test is "whether the disclosure of the application

relied upon reasonably conveys to those skilled in the art that the inventor had possession

of the claimed subject matter as of the filing date." *In re Owens*, 710 F.3d 1362, 1366

(Fed. Cir. 2013) (quoting *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351

(Fed. Cir. 2010) (en banc)).  "In the context of design patents, the drawings provide the

written description of the invention." *Id.*

### 1.      Section 112 Invalidity

The Court agrees with Fresh Products that Vectair's § 112 invalidity arguments

are premature.  As background, the D'411 patent contains fourteen figures illustrating

two embodiments of a urinal screen embodying the claimed design, where those figures

include top and bottom plan views, a perspective view, and right, left, front, and back

elevation views.  (D'411 patent, at 1 (DESCRIPTION).)  The D'411 patent then explains

that "evenly dashed broken lines are used to illustrate features of the urinal screen which

form no part of the claimed design" while "dash-dot-dash broken lines illustrate the

boundary of the claimed invention and form no part of the claimed design."  (*Id.*)

Vectair's indefiniteness and written description arguments are based on reproductions of

57

these figures (with additional annotations by Vectair's attorneys) and attorney argument. (*See* Dkt. 69 at 41-55; *see also* Dkt. 84 at 15-19.)

The problem for Vectair is that its § 112 theories all require evidence as to the perspective of one of ordinary skill in the art. *See Maatita*, 900 F3.d at 1377 ("[A] design patent is indefinite under § 112 **if one skilled in the art, viewing the design as would an ordinary observer**, would not understand the scope of the design with reasonable certainty based on the claim and visual disclosure." (emphasis added); *see id.* at 1375 (explaining that "there is often little difference in the design patent context between the concepts of definiteness" and enablement); *In re Owens*, 710 F.3d at 1366 (holding the written description test is "whether the disclosure of the application relied upon **reasonably conveys to those skilled in the art** that the inventor had possession of the claimed subject matter as of the filing date," where "the drawings provide the written description of the invention" (emphasis added)). "Compliance with the written description requirement is a question of fact," *Scriptpro, LLC v. Innovation Assocs., Inc.*, 762 F.3d 1355, 1359 (Fed. Cir. 2014), requiring that the patentee "convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention," *New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1295 (Fed. Cir. 2002).

Vectair has not offered any evidence of what a person of ordinary skill in the art would understand from the figures of the D'411 patent, or that such a person could not understand those figures with reasonable certainty. At the July 2, 2025 hearing, Vectair conceded that its expert had not opined as to the ability of a person of ordinary skill in the

art or an ordinary observer's ability to understand the drawings. (*See* Dkt. 104 at 99:15-100:15 (admitting no expert opinion).) Vectair's arguments relating to how to interpret various lines in the figures of the D'411 patent, whether the August 12, 2016 Amendment introduced new matter and therefore violated the written description requirement, whether there are sufficient views in the D'411 patent, and whether the boundaries of the claimed design are indefinite rely on its attorneys' characterizations of the figures rather than any evidence from the perspective of a person of ordinary skill in the art. Such attorney argument does not constitute clear and convincing evidence that the D'411 patent is invalid under § 112, particularly where "[e]rrors and inconsistencies between drawings do not merit a § 112 rejection . . . if they do not preclude the overall understanding of the drawing as a whole." *Maatita*, 900 F.3d at 1375-76 (citation modified).

However, the Court will address in this Order certain issues arising from Vectair's § 112 arguments that do not require the perspective of a person of ordinary skill in the art. First, the parties dispute whether Fresh Products can rely on the higher resolution drawings within the "Supplemental Content" of the USPTO Supplemental Complex Repository for Examiners ("SCORE") database of the D'411 patent prosecution file available on the PTO website. (Dkt. 79 at 29 & n.4; Dkt. 84 at 15-16.) Vectair argues that these higher resolution drawings should not be considered because they do not

"directly appear in the D'411 certified file wrapper."[14]  (Dkt. 84 at 15.)  Vectair did not

file a certified copy of the prosecution history of the D'411 patent, and by saying

"directly appear," seems to concede that a reference to this Supplemental Content appears

in the certified file wrapper, even if the Supplemental Content itself does not.  In any

event, the Supplemental Content is readily available from the PTO website by searching

the patent number at https://patentcenter.uspto.gov/.  The Court concludes that the public

notice function is not undermined by reference to documents referenced in the file history

and publicly available on the PTO website.  *See Panasonic Corp. v. Getac Tech. Corp.*,

No. SA CV 19-01118-DOC (DFM), 2022 WL 1599634, at *6 (C.D. Cal. Feb. 28, 2022)

(finding it "appropriate to reference the SCORE images to determine the scope of the

patents at issue since they are in the patents' prosecution histories" (citation modified)).

Vectair also characterizes the allegedly illegible drawings as an "error" that Fresh

Products should have corrected pursuant to 35 U.S.C. § 254.  (Dkt. 84 at 16.)  This

ignores the rationale for the higher resolution drawings, which is that the PTO had

"received feedback that the images published as part of design patent grants were

degraded compared to the images that applicants provided to the Office with initial

filings," due to its "specific conversion process" that was "mainly responsible for the

degraded quality of the images," and the PTO therefore "implemented a new process [on

October 4, 2016] for publishing design patent grants, which has significantly improved

---

[14]     "File wrapper" is another way to refer to the entire record of proceedings in the
PTO, that is, the prosecution history.  *See Standard Oil Co. v. Am. Cyanamid Co.*, 774
F.2d 448, 452 (Fed. Cir. 1985).

the image quality." (Dkt. 89-2 at 2.)  Moreover, the PTO explained that it was "also loading these patent grants, with improved images, into the Supplemental Content of the electronic files of our patent application files **to allow external stakeholders to download an exact, clear copy of the patent grant images**." (*Id.* (emphasis added).) This confirms both the public notice function of the Supplemental Content available from the PTO website and that the quality of originally published images did not constitute a "mistake" that required correction under § 254; but instead an issue caused by the PTO's image conversion process.  The Court sees no basis for precluding reliance on the higher resolution drawings because Fresh Products did not seek their correction under § 254.

Finally, Vectair argues that Fresh Products should not be able to rely on the higher resolution images because Fresh Products "did not request construction about the effect of prosecution history" and "[a] request to substitute different drawings is a new and different claim construction position." (Dkt. 84 at 16.)  This argument fails because Fresh Products cited "Figs. 1-14," "D'411 **supplemental content**," and the "D'411 prosecution history" to support its position in the parties' First Amended Joint Claim Construction Statement.  (Dkt. 68 at 17 (emphasis added).)  This is sufficient to inform Vectair that Fresh Products was relying on the higher resolution drawings included in the Supplemental Content for purposes of claim construction.

In sum, the Court finds that Vectair has not met its burden as to § 112 invalidity at this time.  And while the Court has its doubts (based on the arguments to date) as to whether Vectair can ultimately succeed on its § 112 arguments as to the D'411 patent, Vectair may make those arguments at summary judgment or trial, as appropriate.

## 2.    Vectair Has Not Met Its Burden as to Lack of Ornamentality

Vectair contends that the D'411 patent is invalid because every aspect of its design is primarily functional rather than ornamental.  (Dkt. 69 at 69.)  Fresh Products responds that Vectair has not shown by clear and convincing evidence that the D'411 patent is invalid for lack of ornamentality.  (Dkt. 86 at 37.)

The Federal Circuit has described as "stringent" the clear and convincing evidentiary standard as it applies to invalidating design patents on grounds of functionality.  *Rosco, Inc. v. Mirror Lite Co.*, 304 F.3d 1373, 1378 (Fed. Cir. 2002).

To begin, "[a]rticles of manufacture necessarily serve a utilitarian purpose, but design patents are directed to ornamental designs of such articles."  *Ethicon Endo-Surgery*, 796 F.3d at 1328 (Fed. Cir. 2015).  "Being ornamental is not the inverse of being functional, and the two are not mutually exclusive.  Rather, the two characteristics can—and often do—coexist."  *Graphic Packaging Int'l, LLC v. Inline Packaging, LLC*, No. 15CV03476 (ECT/LIB), 2019 WL 4786148, at *3 (D. Minn. Oct. 1, 2019) (citing *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1123 (Fed. Cir. 1993)), *clarified on other grounds*, 2019 WL 13177147 (D. Minn. Nov. 12, 2019).  "If a particular design is essential to the use of an article, it cannot be the subject of a design patent."  *Ethicon Endo-Surgery*, 796 F.3d at 1328.  The Federal Circuit has "found designs to be essential to the use of an article when the claimed design is dictated by the use or purpose of the article."  *Id.* (citation modified).  Design patents on primarily functional rather than ornamental designs are invalid.  *Id.*

62

Although there is no "particular test for determining whether a claimed design is dictated by its function and therefore impermissibly functional," the Federal Circuit has "often focused . . . on the availability of alternative designs as an important—if not dispositive—factor." *Ethicon Endo-Surgery*, 796 F.3d at 1330; *see also Auto. Body Parts Ass'n v. Ford Glob. Techs., LLC*, 930 F.3d 1314, 1319 (Fed. Cir. 2019) (stating the Federal Circuit "ha[s] often emphasized the presence or absence of alternative designs" in the functionality inquiry). "[T]o be considered an alternative, the alternative design must simply provide the same or similar functional capabilities." *Ethicon Endo-Surgery*, 796 F.3d at 1131 (citation modified); *see also Rosco*, 304 F.3d at 1378-79 (reversing functionality finding because alternative mirror designs could still provide a similar level of performance).

A court may also consider the following "*Berry Sterling*" factors:

whether the protected design represents the best design; whether alternative designs would adversely affect the utility of the specified article; whether there are any concomitant utility patents; whether the advertising touts particular features of the design as having specific utility; and whether there are any elements in the design or an overall appearance clearly not dictated by function.

*Sport Dimension, Inc. v. Coleman Co.*, 820 F.3d 1316, 1322 (Fed. Cir. 2016) (quoting *PHG Techs., LLC v. St. John Cos.*, 469 F.3d 1361, 1366 (Fed. Cir. 2006), quoting *Berry Sterling Corp. v. Pescor Plastics, Inc.*, 122 F.3d 1452, 1455 (Fed. Cir. 1997)).

Relying on the Klopp Declaration, Vectair argues that "[e]very aspect of the claimed article of D'411 is dictated by function." (Dkt. 69 at 69 (citing Klopp Decl. ¶ 71).) Dr. Klopp recites the *Berry Sterling* factors and then opines:

63

51. The D'411 Patent shows but does not definitely claim a flat urinal screen with multiple "posts". The structure shown has a top face and a bottom face (opposite the top face), and hexagonal features that could be multiple openings extending through the top face and bottom face. These features are defined by a hexagonal perimeter structure with braces and corners.

52. The design illustrates that the braces and corners are shared between two or more openings. The D'411 Patent contains fourteen figures that present different views of two embodiments of the urinal screen.

(Dkt. 72 ¶¶ 50-52 (footnotes omitted).) This description of the D'411 patent does not constitute an opinion on the ornamentality or functionality of the entire design. Dr. Klopp next engages in an element-by-element analysis of the functions of the claimed design, including opining that:

- "Openings" perform the function of filtering and screening debris while allowing urine, water, and other liquids to pass (*id.* ¶ 53);

- "Hexagonal perimeter structure" performs the function of saving material (*id.* ¶¶ 54-60);

- "Non-planar brace faces" perform the function of reducing splashing (*id.* ¶ 61);

- "Size and number of openings" perform the functions improving filtering and screening debris; reducing splashing; minimizing weight; and improving odor control (*id.* ¶¶ 62-64);

- "Posts" perform the function of reducing splashing (*id.* ¶ 65);

- "Post geometry" performs the functions of reducing splashing, controlling flow and odor, and cost-effective manufacturing (*id.* ¶ 66);

- "Post location" performs the function of reducing splashing and increasing structural strength (*id.* ¶¶ 67-68);

- "Post length" performs the function of improving filtration and screening debris (*id.* ¶ 69); and

64

- "Flat/planar shape of the urinal screen" performs the function of improving filtration and screening debris and improving odor control (*id.* ¶ 70).

Dr. Klopp concludes: "From my review of the D'411 Patent, the claimed articles of the D'411 Patent are significantly functional and dictated by functionality that is, in some cases, disclosed in the Utility Patents . . . ." (*Id.* ¶ 71.)

Vectair relies on these opinions, as well as the fact that Fresh Products owns several utility patents and a pending application directed to the claimed urinal screen, to support its argument that the D'411 patent is invalid for lack of ornamentality. (Dkt. 69 at 69-70.) Fresh Products responds that "Vectair's failure to address alternative designs is reason enough to reject Vectair's lack-of-ornamentality argument." (Dkt. 86 at 37.) Fresh Products further argues that "a design patent is not invalid merely because the patentee owns related utility patents." (*Id.*)

While Dr. Klopp opined that various elements of the urinal screen are functional, he did not address alternative designs for those elements. (*See* Dkt. 72 ¶¶ 50-70.) Given that the existence of alternative designs is "an important—if not dispositive—factor in evaluating the legal functionality of a claimed design," the absence of any opinions as to alternative designs weighs strongly against any finding that the D'411 patent is invalid for lack of ornamentality. *See Ethicon Endo-Surgery*, 796 F3d at 1329-30. Indeed, in *L.A. Gear*, the Federal Circuit rejected a finding of invalidity for lack of ornamentality where the accused infringer "argue[d] that each element comprising the '081 design has a utilitarian purpose" because "the utility of each of the various elements that comprise the design is not the relevant inquiry with respect to a design patent." 988 F.2d at 1123.

65

Rather, "the claimed design is viewed in its entirety, for the ultimate question is not the functional or decorative aspect of each separate feature, but the overall appearance of the article, in determining whether the claimed design is dictated by the utilitarian purpose of the article." *Id.*

Further, Fresh Products identified three designs that Fresh Products says do not practice the '411 patent and, based on Dr. Hurd's opinions, achieve the same or similar functionalities identified by Vectair with respect to the D'411 design patent. (Dkt. 79 at 35; Dkt. 86 at 34-36 (citing Dkt. 88 ¶¶ 48-52).) Images of those three screens are reproduced below.



| Impact Eclipse Urinal Screen | Big D Diamond 3D Urinal Screen | Vectair Sanis Urinal Screen |
|---|---|---|

(Dkt. 86 at 35.)

According to Dr. Hurd, the Impact Eclipse Urinal Screen achieves similar functionality using an alternative design that is different from that claimed in the D'411 design patent, where the Impact Eclipse is made of a fragranced polymer, which forms a lattice-like structure with four-sided openings in a swirled arrangement and posts extending from both sides. (Dkt. 88 ¶ 50.) Marketing materials for the Impact Eclipse

screen state that it "eliminates virtually all splash back," contains fragrance, is "designed to fit virtually all urinal shapes and sizes," and provides "effective drain and trap protection."  (Dkt. 89-3 at 31.)

The second screen identified by Dr. Hurd is the Big D Diamond 3D Urinal Screen ("Diamond 3D") (Dkt. 88 ¶ 51.)  The Diamond 3D screen is made from a fragranced polymer, which forms a lattice-like structure with diamond-shaped openings emanating from the center and many posts extending from both sides of the urinal screen.  (*Id.*)  Dr. Hurd opined that the Diamond 3D screen achieves similar functionality using an alternative design that is different from that claimed in the D'411 design patent.  (Dkt. 88 ¶ 51.)  Marketing materials for the Diamond 3D urinal screen state that it has "anti-splash" spikes of three varying lengths on both sides of the mat, is made of a polymer impregnated with fragrance, is flexible thereby allowing it to fit any urinal contour, it is translucent allowing viewing to ensure that the drain remains free flowing, and it contains an area for writing.  (Dkt. 89-4 at 2-3.)

As noted above, Vectair does not address the alternatives, except in a conclusory fashion, by asserting that alternative designs are not the "best design," arguing that Fresh Products' marketing materials and internal communications establish functional performance, and again relying on the "utility patent claims and disclosures" (including the best mode requirement under 35 U.S.C. § 112(a)).  (Dkt. 84 at 20 & n.5.)  This is unpersuasive because Vectair's "best design" argument is not supported by any evidence or authority linking the "best mode" requirement of § 112 to whether a protected design represents the "best design" under *Berry Sterling*, and the existence of related utility

patents is relevant but not dispositive as to the question of ornamentality.  *See Sport Dimension*, 820 F.3d at 1322 (listing factors).

Finally, the fact that certain elements of the claimed urinal screen may perform functions does not preclude them from "contribut[ing] to the overall ornamentation of the design."  *See id.* at 1323 ("And the design includes the shape of the armbands and side torso tapering, to the extent that they contribute to the overall ornamentation of the design."); *see also Ethicon Endo-Surgery*, 796 F.3d at 1329 ("We explained that a claimed design was not invalid as functional simply because the 'primary features' of the design could perform functions.") (citing *High Point Design LLC v. Buyers Direct, Inc.*, 730 F.3d 1301, 1316 (Fed. Cir. 2013)).  This is why the Federal Circuit has cautioned that "[i]n determining whether a claimed design is primarily functional, the function of the article itself must not be confused with 'functionality' of the design of the article."  *Id.* (citation modified).

Given the lack of evidence showing the absence of alternative designs and that the claimed design is the "best design," and Dr. Hurd's opinion that there are alternative designs, the Court concludes that Vectair has not met its burden to shown that the design claimed by the D'411 patent is invalid due to lack of ornamentality.  *See Ethicon Endo-Surgery*, 796 F.3d at 1332; *see also Deetsch v. Lei*, No. 22-CV-1166-RSH-BLM, 2024 WL 4700642, at *5 (S.D. Cal. Nov. 6, 2024) ("Plaintiff has provided the Court with evidence showing that alternative designs exist and are available.  Defendants have not provided the Court with any evidence regarding alternative designs.  In their claim construction brief, Defendants simply argue: 'alternative designs are certainly not the best

68

design, and they adversely affect the functionality of the patented design.' But attorney argument is not evidence and cannot rebut other admitted evidence. Therefore, Defendants have failed to demonstrate that the overall design of the '529 Design Patent is purely functional." (citation modified)).

### 3.   Claim Construction

The Court turns to claim construction. First, Vectair asserts that the "Urinal Screen" title of the D'411 patent is limiting and proposes: "[A] filter, mat, grate, guard, or the like capable of allowing urine, water, and other fluid to pass through it when used in, on, or otherwise as part of a urinal, toilet, or other bathroom appliance. And a 'urinal' is a vessel for receiving urine or a fixture used for urinating." (Dkt. 69 at 55; *see also id.* at 17 (proposed construction for the utility patents).) Fresh Products does not disagree that the title is limiting, but argues that the term should be given its plain and ordinary meaning. (Dkt. 86 at 31.)

"Where a design is claimed 'as shown and described'. . . then the patent's scope of protection is limited by the drawings and accompanying description in the patent." *See Smartrend Mfg. Grp. , Inc. v. Opti-Luxx Inc.*, 159 F.4th 1322, 1329-30 (Fed. Cir. 2025) (quoting *Curver Lux., SARL v. Home Expressions Inc.*, 938 F.3d 1334, 1340-41 (Fed. Cir. 2019)). Here, for the reasons stated in Section III.A.2, the Court gives "urinal screen" in the title its plain and ordinary meaning.

Second, Vectair proposes a claim construction that require construction of "the use of various lines and line type descriptions," identification of multiple embodiments, and identification of functional aspects and elements. (Dkt. 69 at 57-69.) Vectair's proposed

construction, as set forth in the First Amended Joint Claim Construction Statement, spans multiple pages and includes references to figures in the D'411 patent that have been annotated by counsel. (Dkt. 68 at 16-25.) Fresh Products responds that Vectair's verbal descriptions are inaccurate, improper, and "illustrate[] the Federal Circuit's precise concerns with verbal descriptions of design patents." (Dkt. 86 at 30-31.)

The Court begins with Vectair's multi-paragraph proposed construction and explanation of lines and line descriptions, which includes annotations of the figures. (*See* Dkt. 69 at 57-59; Dkt. 68 at 17-22.) The D'411 patent states that "evenly dashed broken lines are used to illustrate features of the urinal screen which form no part of the claimed design" while "dash-dot-dash broken lines illustrate the boundary of the claimed invention and form no part of the claimed design." (D'411 patent, at 1 (DESCRIPTION).) Given the absence of any evidence that a person of ordinary skill in the art would not understand what the various lines show in the figures based on the intrinsic record, the Court declines to adopt Vectair's verbose restatement of the two-sentence description of those lines set forth in the D'411 patent itself.

The Court then turns to Vectair's argument that the Court must construe the claimed design as including two embodiments. (Dkt. 69 at 60-61.) Vectair proposes: "'a first embodiment', shown in FIGS. 1-7, and 'a second embodiment', shown in FIGS. 8-14, represent different embodiments of the overall ornamental design, with those first and

second embodiments claimed in the alternative (like a *Markush* group)."[15]  (Dkt. 68 at

24-25.)  But the D'411 patent already states that Figure 1 shows "a first embodiment of a

urinal screen embodying our new design" (where Figures 2-7 are different views

"thereof") and Figure 8 shows "a second embodiment of a urinal screen embodying our

new design" (where Figures 9-14 are different views "thereof").  (D'411 patent, at 1

(DESCRIPTION).)  No claim construction is necessary to understand that Figures 1 to 7

and Figures 8 to 14 describe first and second embodiments.  It appears that Vectair wants

the Court to add to this description by describing the embodiments as "alternatives" and

similar to a *Markush* group, but cites no authority supporting this proposed

construction—and admits it could find none.  (Dkt. 69 at 61.)  Vectair contends "this

dispute" will affect expert reports and dispositive motions and asks: "If the claimed

embodiments are not alternatives, how else are they to be compared to the accused

product or prior art?"  (*Id.*)  The Court declines to adopt Vectair's proposed limitations

due to questions asked in the abstract.  If the parties actually need to resolve the question

of whether the first and second embodiments are "alternatives" for purposes of

infringement and prior art invalidity, they should address the question at that time when

any such disputes are ripe and sufficiently articulated.

Third, Vectair proposes a verbal description of the "[f]unctional aspects/elements"

that is so lengthy that Vectair presented it in "shorted [sic] form for readability" in its

---

[15]      "A *Markush* group is a listing of specified alternatives of a group in a patent claim,
typically expressed in the form: a member selected from the group consisting of A, B,
and C."  *Abbott Labs. v. Baxter Pharm. Prods., Inc.*, 334 F.3d 1274, 1280 (Fed. Cir.
2003).

brief.  (*Compare* Dkt. 69 at 38 & n.9 (Vectair's opening brief), *with* Dkt. 68 at 16-25

(First Amended Joint Claim Construction Statement).)  For context, it is worth reciting

Vectair's entire proposal:

- Functional aspects/elements:

  o Filtering/screening (ability to block or retain foreign objects/debris while allowing urine, water, and other fluid to pass through)

  o Reducing or preventing the risk of the article from floating away from a desired installation location, by spacing portions of the article from the surface on which the article is set

  o Splash management / deflection or directing of urine or other fluid

  o Structural support and connecting/arranging elements of the article

  o Mass reduction (such as the amount of open space compared to the amount of solid material, the amount, density, and/or cost of material, and shipping weight)

  o Fragrance delivery over time (such as being made of a sufficient amount of solid material that can releasably hold a sufficient amount of impregnated fragrance, preventing the article from being completely submerged in water during use which would block fragrance release)

  o Manufacturability (for example, physical structure able to be molded from a fragranced polymer material, physical structures such as braces and posts/protrusions shaped with tapers/draft angles, chamfers, rounded surfaces, fillet radii, etc. to release easily from a mold, solid portions provide surface area for ejection pins in mold tooling to help release the article from the mold, avoiding stress concentrations and/or structural failure points)

  o Fit in urinal, toilet, or other bathroom appliance (for instance, the overall shape can fit over a drain and cover it sufficiently, accommodation of many different varied shapes of urinal, toilet, or other bathroom appliance structures)

  o Ease of installation (for instance, any attachment requirements, reversibility, impacts of installation on subsequent performance)

      o  Display of information (for instance, branding and/or other markings, installation/replacement date-tracking tabs, etc.)

      o  Visibility of debris/clogging underneath (such as the amount, size, and arrangement of openings in relation to translucent/transparent nature of solid material of the article)

(Dkt. 68 at 22-24.)

It is true that "[w]here a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent." *OddzOn Prods.*, 122 F.3d at 1405. But it is also true that:

> [T]he court is not obligated to issue a detailed verbal description of the design if it does not regard verbal elaboration as necessary or helpful. In addition, in deciding whether to attempt a verbal description of the claimed design, the court should recognize the risks entailed in such a description, such as the risk of placing undue emphasis on particular features of the design and the risk that a finder of fact will focus on each individual described feature in the verbal description rather than on the design as a whole.

*Egyptian Goddess*, 543 F.3d at 679-80. Moreover, "design patents protect the overall ornamentation of a design, not an aggregation of separable elements." *Sport Dimension*, 820 F.3d at 1322.

In *Richardson v. Stanley Works, Inc.*, the Federal Circuit affirmed the district court's decision to separate the functional and ornamental aspects of the claimed design for a multi-function tool. 597 F.3d at 1294. In doing so, the Federal Circuit noted that "[b]y definition, the patented design is for a multi-function tool that has several functional components." *Id.* The Federal Circuit explained:

> Richardson's multi-function tool comprises several elements that are driven purely by utility. As the district court noted, elements such as the handle, the

73

hammerhead, the jaw, and the crowbar are dictated by their functional purpose. The jaw, for example, has to be located on the opposite end of the hammer head such that the tool can be used as a step. The crowbar, by definition, needs to be on the end of the longer handle such that it can reach into narrow spaces. The handle has to be the longest arm of the tool to allow for maximum leverage. The hammer-head has to be flat on its end to effectively deliver force to the object being struck. As demonstrated by the prior art, those are purely functional elements whose utility has been known and used in the art for well over a century.

*Id.*

In the underlying claim construction decision, the district court explained: "[The] design incorporates four primary utilitarian elements: the handle, the hammer-head, the jaw, and the crow-bar. The overall configuration of these four elements is dictated by the functional purpose of the tool and therefore is not protected by his design patent." *Richardson v. Stanley Works, Inc.*, 610 F. Supp. 2d 1046, 1050 (D. Ariz. 2009), *aff'd*, 597 F.3d 1288 (Fed. Cir. 2010). The district court explained why different configurations would not work, noted that "[e]very piece of prior art identified by the parties that incorporates similar elements configures them in the exact same way," and explained that "[t]he number of other patented designs that use this configuration and the absence of alternative designs strongly suggest that this configuration is the best configuration and that it is dictated by functional, not ornamental, considerations." *Id.* In addition to finding that the "overall configuration," where the hammer-head and jaw were at one end of the handle and the crow-bar at the other end, was not protected, the *Richardson* district court found that the jaw's design consisting "of two straight sides that could slot over a wooden board at a right angle to the handle, which would then serve as the step," also was not protected. 610 F. Supp. 2d at 1050. But the design patent did protect "the

74

ornamental aspects of Richardson's design, which include[d], among other things, the standard shape of the hammer-head, the diamond-shaped flare of the crow-bar and the top of the jaw, the rounded neck, the orientation of the crowbar relative to the head of the tool, and the plain, undecorated handle," as well as the particular number and size of the teeth of the jaw. *Id.*

Similarly, in *OddzOn Products*, the claim construction approved by the Federal Circuit was:

> a ball shaped like a football, with a slender, straight tailshaft projecting from the rear of the football. In addition, the '001 Patent design has three fins symmetrically arranged around the tailshaft, each of which has a gentle curve up and outward which creates a fin with a larger surface area at the end furthest from the ball. The fins flare outwardly along the entire length of the tailshaft, with the front end of the fin extending slightly up along the side of the football so that the fins seemingly protrude from the inside of the football.

122 F.3d at 1400. The Federal Circuit observed that "the district court carefully noted the ornamental features that produced the overall 'rocket-like' appearance of the design" and found it "properly limit[ed] the scope of the patent to its overall ornamental visual impression, rather than to the broader general design concept of a rocket-like tossing ball." *Id.* at 1405.

Here, Vectair's proposed construction consisting of bullet points reciting alleged functionality bears no resemblance to the constructions in *Richardson* and *OddzOn Products*. In fact, the Court cannot even determine what aspects of the design Vectair is asking the Court to exclude. For example, it is unclear whether Vectair is asking the Court to exclude the openings entirely, or to exclude openings having the size, shape, and spacing shown in the figures. If Vectair is proposing that the openings are not protectable

at all because they perform filtering and screening functions, Vectair invites the Court to "eliminat[e] structural elements from the claim," which would "improperly convert[] the claim scope of the design patent from one that covers the overall ornamentation to one that covers individual elements." *Sport Dimension*, 820 F.3d at 1322 (finding district court erred in excluding "armbands and side torso tapering from the claim entirely" even though they "serve[d] a functional purpose").[16]  If Vectair is proposing the posts having the size, shape, and spacing shown in the figures are not protectable, Vectair has come nowhere close to showing that those aspects of the posts are the "best design" for filtering and screening or whether alternative designs would affect the utility of the claimed urinal screen. *See id.*

In sum, Vectair could have proposed a construction that excluded certain elements of the design as functional and could have supported that proposed construction with evidence that those elements as shown in the design were the best design for achieving the urinal screen's functionality or that no alternative designs were as effective.  It may well be that the openings (for example) themselves are functional and should be excluded because they are necessary to perform the functions of filtering and screening debris while permitting urine to drain from the urinal, while the openings' size, shape, and positioning should not be excluded because there is no evidence that those features are

---

[16]    The claim construction adopted by the district court was: "The ornamental design for a personal flotation device, as shown and described in Figures 1-8, except the left and right armband, and the side torso tapering, which are functional and not ornamental." *Sport Dimension*, 820 F.3d at 1319.

dictated by function.  Indeed, several cases support that conclusion.  *See Graphic Packaging Int'l*, 2019 WL 4786148, at *5 (D. Minn. Oct. 1, 2019) (quoting *Calphalon Corp. v. Meyer Corp.*, No. CIV. S-05-971 WBS DAD, 2006 WL 2474286, at *2 n.3, n.5 (E.D. Cal. Aug. 25, 2006) ("The holes are functional in that they serve the purpose of dissipating heat, but the position and shape of the holes is not 'dictated by' this function.  Therefore, the court construes the shape and position of the holes in describing the overall appearance of the design. . .  As with the other holes on the handle, this hole is not part of the patent claim by virtue of its presence on the handle (it clearly has a functional purpose—it allows the pan to be hung from a hook).  However, the functional purpose does not require a certain shape for the hole, and it is therefore an element of the design patent that the court must construe."); *Nordock Inc. v. Sys. Inc.*, 927 F. Supp. 2d 577, 589 (E.D. Wis. 2013) ("[T]here are many shapes of lugs, and lugs with gussets and partial gussets.  The shape, spacing, pairing and the difference in shapes between the lugs attached to the header plate and the lip are also ornamental features of the '754 patent."); *Black & Decker (U.S.) Inc. v. Pro-Tech Power Inc.*, No. 97-1123-A, 1998 WL 633636, at *6 (E.D. Va. June 2, 1998) ("Must the aperture in the handle support be triangular, or would a circular (or square) aperture work?")), *opinion clarified on other grounds*, 2019 WL 13177147 (D. Minn. Nov. 12, 2019).  But there certainly is no basis in the record for Vectair's proposed construction.  The Court finds that verbal elaboration construing the claimed designs is not necessary or helpful, *see Egyptian Goddess*, 543 F.3d at 679, and therefore construes the D'411 patent's claim as: "The overall ornamental appearance of the urinal screen as shown in Figures 1-14."

## VI.   ORDER

Based on the files, records, and proceedings herein, **IT IS ORDERED** that the claims of U.S. Patent Nos. 10,145,098; 10,501,924; 11,396,745; and D778,411 are construed as set forth above.

DATED: March 9, 2026

_s/Elizabeth Cowan Wright_
ELIZABETH COWAN WRIGHT
United States Magistrate Judge